The State ex rel. The Wisconsin Telephone Co. vs. City of Sheboygan.

---

THE STATE EX REL. THE WISCONSIN TELEPHONE COMPANY, Appellant, vs. THE CITY OF SHEBOYGAN and others, Respondents,

*May 21 — June 20, 1901.*

*Telephone companies: Right to use streets: Grant of franchise: Right of city to regulate and impose conditions.*

1. The word "highway," as used in sec. 1778, Stats. 1898 (authorizing any telephone company to construct its lines along any public highway), covers the streets and ways of a city, as well as rural highways.

The State ex rel. The Wisconsin Telephone Co. vs. City of Sheboygan.

2. Sec. 1778, Stats. 1898, grants to telephone companies a franchise to use the streets, and although a city may, under its charter, have power to regulate such use, yet its consent to the construction of a telephone line on certain streets is necessary only in view of such right to regulate, and the giving of such consent is not the granting of a franchise within the meaning of sec. 940b, Stats. 1898.

3. Under its police power to control and regulate the use of its streets, a city may provide by ordinance that the location of all poles shall be subject to the approval of the proper city authorities, and that the further occupation of the streets shall be upon a plan to be approved by the council; but it cannot, under the pretense of regulating, take away entirely the right of a telephone company, under sec. 1778, Stats. 1898, to construct its lines on the streets of the city.

4. When a telephone company submits for the approval of the proper authorities, under such an ordinance, its plans for construction of lines in the streets, it is the duty of such authorities to take affirmative action recognizing the company's right; and they cannot justify a refusal to act upon the ground that the streets are already incumbered by poles and wires and that a change to an underground system should be made "as soon as possible."

5. A city has only such powers with respect to the wires and poles of a telephone company in its streets as have been granted to it by the legislature.

6. Under charter provisions empowering a city to enact proper ordinances and regulations for the government and good order of the city, for the benefit of trade and commerce, to prevent the incumbering of streets, and to regulate the manner of using streets and protect them from injury, the city has no power to impose any conditions upon the use of its streets by a telephone company except such as may fairly be said to be police regulations. It cannot require the company to accept an ordinance fixing the rates to be charged for telephone service; nor can it exact financial benefits to itself, such as a right to purchase the company's exchange, a right to use the tops of the poles for a fire-alarm system, free of charge, or a right to take the company's property by forfeiture in case of nonuse.

7. Nor has the city, in such a case, the right to refuse to act upon the plans of the telephone company submitted for approval, and thus prevent the construction of the proposed lines, on the ground that ruinous competition in telephone rates would result. Its power to regulate trade and commerce does not extend to controlling competition.

APPEAL from an order of the circuit court for Sheboygan county: MICHAEL KIRWAN, Circuit Judge. *Reversed.*

The relator, *The Wisconsin Telephone Company*, presented to the circuit court for Sheboygan county its petition for an alternative writ of *mandamus*, setting out the following facts:

The relator is a Wisconsin corporation, organized in 1882, conducting a telephone business and maintaining telephone lines and exchanges in this state. The defendant city of *Sheboygan* is a municipal corporation, and the other defendants mayor, clerk, and aldermen of said city. The petition sets out the charter provisions regarding control and regulation of city streets, and that in 1893 the council adopted an ordinance providing that the location and erection of all poles, etc., should be subject to the approval of the city authorities, and that the occupation of all streets not already occupied should be upon a plan submitted and approved by the common council. In 1882 the relator established an exchange in the city of *Sheboygan*, which was a part of its state system and connected with other exchanges east of the Mississippi and north of the Ohio rivers. The exchange was established without any grant of authority or permission from the city, but its poles were put up and wires strung with its knowledge and consent, and without objection, until 1893, when a competing line was built under an ordinance, a copy of which was attached. Since that time the city has insisted that relator had no right to place any additional poles upon any of its streets without permission, has refused to consent to the location of any poles or to the extension of its system, has used force to prevent the same, and has seriously interfered with the making of necessary repairs. Since 1893 relator's exchange has not been, and is not now, in accord with the most approved plan of telephone construction, in particulars fully set out. There are many places in the city which cannot be supplied with telephones

The State ex rel. The Wisconsin Telephone Co. vs. City of Sheboygan.

as the lines are now located, and cannot be reached without setting up additional poles. Relator has been and is now desirous of perfecting its system, extending its lines, and making the same according to the most approved plan of telephone construction. On September 11, 1899, the relator presented to the mayor and common council a petition stating its desires and a willingness to conform to any and all reasonable requirements or changes thought necessary or desirable in its proposed plan. Attached to the petition was a map of the city showing the location of its poles, the changes proposed, and extensions contemplated. The city authorities were asked to approve the plan and grant permission for the proposed extensions and changes, and, if the plan was not approved, to suggest such changes therein as were deemed for the best interests of the city. Such petition was referred to a special committee of the council. After a conference with the representatives of the company, the committee reported that the latter refused to accept a franchise on the same conditions granted to the Northwestern Telephone Company, which was the competing company before referred to, and recommending that action on the petition be temporarily postponed. Such report was adopted, and no further action on said petition has been taken.

The petition herein further sets out that relator was willing to accept a franchise which conformed to the one mentioned except so much of the same as assumed to regulate the rate of telephone charges, and except as to the following requirements: a provision that, should the city desire to purchase the exchange at a price to be fixed by appraisers, it would convey its exchange to the city; the use of the top thirty inches of all poles for the police and fire-alarm or other electric system, free of charge; a condition that, in case the company failed to maintain and operate its exchange, its rights should be forfeited and its property and poles therein

used by the city should become the property of the city; and, lastly, in case the city should construct an exchange for the use of its officials, and not for private use, the city should have the right to connect its exchange with that of relator, and have the same right to use its telephones in connection with relator's as are given to its patrons, free of charge. The refusal of the city to approve the plan presented prevents the relator from making the changes and extensions desired, and, unless the city be required to take action thereon, relator has no remedy in the premises.

An alternative writ of *mandamus* was issued, to which the defendants made due return. After many admissions and denials, the return sets out that the petition, map, and plan of relator before referred to was intended by relator to constitute, and would in law constitute, if approved by the city, a grant or franchise to use the streets and alleys named for its purposes, and that no application for such franchise had ever been published in the official paper of the city, as required by sec. 940$b$, Stats. 1898; that the action of the council on said petition was not based solely upon the refusal of relator to accept a franchise fixing rates, but was based upon the power, authority, and discretion of the common council to require and enact reasonable regulations and by-laws, such as were contained in the franchise granted to the other company, and embodying the conditions hereinbefore mentioned. The return also sets out that the streets of the city are now, and since 1896 have been, incumbered and obstructed to a great extent by the poles of the different telephone, telegraph, electric light, and electric street-railway companies, and by poles belonging to the city used for its fire-alarm system; and that a prudent exercise of the power vested by law in the council requires that a change be made in the mode of running wires, and that they be required to run underground as soon as practicable. It also sets out that relator has not and cannot

obtain the consent of lot-owners to place poles in the streets, and has not the power of eminent domain, and that the granting of the petition would be vain and nugatory. Further, that the relator's exchange was erected without right; is defective and inadequate; a source of annoyance and a nuisance to the inhabitants; is being maintained to create a monopoly, and to compel the other company to either raise its rates, go out of business, or consolidate with relator, and to that end has refused to submit to any regulation fixing charges, and has offered its telephones free of charge. The field is limited as to patronage, and a franchise to relator without regulation as to charges would result in impairing the efficiency of service, or in the insolvency or consolidation of the companies. It was to prevent this disastrous condition of affairs, and because the council did not wish to legalize the present unlawful structures of relator in the streets, that the petition of relator was refused. The right to deny the petition as a matter of discretion was also claimed. By further allegations the defendants disclaim the right to control through or long-distance business of the company, but insist that local business may be continued under reasonable regulations. The return sets out an ordinance adopted in 1893 regulating the erection of poles and the stringing of wires for the transmission of electricity, being secs. 183 to 216. Sec. 187 provides that the exact location of all poles shall be subject to the approval of the proper city authorities, and that the occupation of all streets not already occupied shall be upon a plan to be approved by the common council.

A demurrer to the return on the ground that it did not state facts sufficient to constitute a defense to the issuance of the writ was overruled. In a lengthy written opinion, the trial judge bases his ruling largely upon noncompliance with sec. 940b. The relator appeals from the order overruling the demurrer.

The State ex rel. The Wisconsin Telephone Co. vs. City of Sheboygan.

For the appellant there were briefs by *Miller, Noyes &
Miller,* and oral argument by *Geo. P. Miller.* They argued,
among other things, that sec. 1778 authorizes telephone
companies to use streets for telephone purposes without ob-
taining any consent from the local governing instrumental-
ities. This statute was copied from Massachusetts. Laws
Mass. 1849, ch. 93. Sec. 3 of the Massachusetts act provides
that the poles shall be located where the local authorities
may provide. *Young v. Yarmouth,* 9 Gray, 388, 389. When
Wisconsin adopted the Massachusetts statute it failed to re-
enact the third section of the statute. See *Roberts v. Wis.
T. Co.* 77 Wis. 589. It is also the duty of a telephone com-
pany to make all necessary extensions. Sec. 1791*a,* Stats.
1898. The neglect or refusal of the relator to make neces-
sary extensions in the city of *Sheboygan* so as to afford tele-
phones to all persons applying for the same, subjects it not
only to a severe penalty, but is such an offense as would
work a forfeiture of its charter under the provisions of sec.
3241. For a failure in this regard the attorney general
could file a petition under sec. 3241 to forfeit the franchises
of the *Wisconsin Telephone Company.* *Wright v. Milwaukee
E. R. & L. Co.* 95 Wis. 36. Its duty to make necessary ex-
tensions could also be enforced by proper legal proceedings.
*Att'y Gen. v. W. W. R. Co.* 36 Wis. 466; *Wright v. Milwau-
kee E. R. & L. Co.* 95 Wis. 36. The streets of the city of
*Sheboygan* belong to the public, not to the city of *Sheboy-
gan.* 2 Dillon, Mun. Corp. §§ 656, 675; *Paine L. Co. v. Osh-
kosh,* 89 Wis. 460; *Marshfield v. Wis. T. Co.* 102 Wis. 609;
*Milwaukee v. M. & B. R. Co.* 7 Wis. 85; *Sheboygan v. S. &
F. du L. R. Co.* 21 Wis. 667; *Janesville v. Carpenter,* 77 Wis.
297. The legislature, having paramount authority over
the streets, has delegated to the city of *Sheboygan,* a subor-
dinate local governing instrumentality, the right to exercise
in a limited way the police power of the state. This grant
of police power to a city to regulate and control the streets

The State ex rel. The Wisconsin Telephone Co. vs. City of Sheboygan.

is to be strictly construed and can only be exercised for the general welfare and good order of the city and its inhabitants. 1 Dillon, Mun. Corp. (4th ed.), § 89; 15 Am. & Eng. Ency. of Law (1st ed.), 1041, and note 1; *Hayes v. Appleton,* 24 Wis. 544; *Bell v. Platteville,* 71 Wis. 142; *Dore v. Milwaukee,* 42 Wis. 108; *Gilman v. Milwaukee,* 61 Wis. 588; *Kilvington v. Superior,* 83 Wis. 226; *Becker v. La Crosse,* 99 Wis. 417; *Barling v. West,* 29 Wis. 307; *State ex rel. Wis. T. Co. v. Janesville St. R. Co.* 87 Wis. 79; *Wis. T. Co. v. Marshfield,* 102 Wis. 610, 611, 613; *Wis. T. Co. v. Oshkosh,* 62 Wis. 40. The power to regulate the streets conferred upon a city does not authorize it to exclude a telephone company from the city. *Wis. T. Co. v. Oshkosh,* 62 Wis. 40; *Marshfield v. Wis. T. Co.* 102 Wis. 611; *Mich. T. Co. v. Benton Harbor,* 121 Mich. 512; *Abbott v. Duluth,* 104 Fed. Rep. 833. Power to regulate and control streets does not authorize a common council to grant telephone or other franchises. *Davis v. New York,* 14 N. Y. 506; *Domestic T. Co. v. Newark,* 49 N. J. Law, 344; 2 Dillon, Mun. Corp. (4th ed.), §§ 715–717; Booth, St. R'y Law, 9, note. The power to regulate charges for telegraph and telephone services is not expressly granted by the charter, and is not included in or incidental to the power to regulate streets or the power to regulate the manner of using streets. *St. Louis v. Bell T. Co.* 96 Mo. 623. The city has no authority to exact financial benefits to itself as a condition of its granting to relator a permit to make necessary telephone extensions.

*T. M. Bowler,* city attorney, for the respondents, contended, *inter alia,* that in all cases where its consent is required the city can fix the maximum charge for any public service within the city which requires the use of its streets, as a regulation of such use. *Rogers Park W. Co. v. Fergus,* 178 Ill. 571; *S. C.* 180 U. S. 624; *Danville v. Danville W. Co.* 180 Ill. 235; *Danville W. Co. v. Danville,* 180 U. S. 619; *Freeport W. Co. v. Freeport,* 186 Ill. 179; *S. C.* 180 U. S.

The State ex rel. The Wisconsin Telephone Co. vs. City of Sheboygan.

587. The city of *Sheboygan* might fix the fare to be charged by hackmen and cabs for the purpose of preventing extortion and under the authority to regulate. *Comm. v. Gage*, 114 Mass. 328; *Comm. v. Duane*, 98 Mass. 1; Dillon, Mun. Corp. (4th ed.), §§ 357, 359, and cases. See, also, as to necessity for regulating telephone companies, *Richmond v. Southern B. T. Co.* 174 U. S. 761. A municipality which is empowered by law to consent to the use of its streets, although not authorized specially to impose conditions, may nevertheless impose reasonable conditions. *Allegheny v. Millville, E. & S. St. R. Co.* 159 Pa. St. 411; *Chicago G. R. Co. v. Chicago*, 176 Ill. 253; Dillon, Mun. Corp. (4th ed.), § 706; *Mich. T. Co. v. Charlotte*, 93 Fed. Rep. 11. Making this police regulation a condition of consent at the time of granting permission to use the streets need rest on no express provision of statute or charter. *Allegheny v. Millville, E. & S. St. R. Co.* 159 Pa. St. 411; *Chicago G. R. Co. v. Chicago*, 176 Ill. 253; *Adams v. Union R. Co.* 21 R. I. 134; *People ex rel. West Side St. R. Co. v. Barnard*, 110 N. Y. 548.

BARDEEN, J. The relator is a Wisconsin corporation organized for the purpose of establishing, maintaining, and operating a system of telephones in this state. It has such powers, and is subject to such restrictions and regulations, as are granted and prescribed by law. Its authority to use and occupy the streets and highways of the state is granted by sec. 1778, Stats. 1898, which came into existence in 1848. So far as is material to this litigation, such section reads as follows:

"Any corporation formed under this chapter to build and operate telegraph lines, or conduct the business of telegraphing, may construct and maintain any such lines with all necessary appurtenances, from point to point upon or along or across any public road, highway or bridge or any stream or body of water, or upon the land of any owner consenting thereto, and from time to time extend the same at pleasure;

The State ex rel. The Wisconsin Telephone Co. vs. City of Sheboygan.

. . . but no such telegraph line or any appurtenance thereto shall at any time obstruct or incommode the public use of any road, highway, bridge, stream or body of water."

The right of a telephone company to organize, to erect lines, and to do business under our laws, and especially under sec. 1778, was first challenged in the case of *Wisconsin Tel. Co. v. Oshkosh*, 62 Wis. 32. That right was vindicated in an opinion by the present chief justice, which has been cited with approval in many jurisdictions. *Duke v. Central N. J. T. Co.* 53 N. J. Law, 341; *Cumberland T. & T. Co. v. United E. R. Co.* 12 L. R. A. 544; *Hudson River T. Co. v. Watervliet T. & R. Co.* 135 N. Y. 393; *Southern Bell T. & T. Co. v. Richmond*, 78 Fed. Rep. 858. This court has sanctioned the doctrine stated in *Roberts v. Wis. Tel. Co.* 77 Wis. 589; *Marshfield v. Wis. Tel. Co.* 102 Wis. 604; *Krueger v. Wis. Tel. Co.* 106 Wis. 96. The exact nature and scope of the power thus conferred has at no time been definitely treated. In the *Oshkosh Case* this court held that a telephone company might lawfully organize under ch. 86, and construct and operate its lines under sec. 1778, and it was there said that the company was occupying the street "*not only by express grant of the legislature*, but by express permission of the city authorities." In the *Roberts Case* the contest was whether poles set by the company were unlawful structures in a highway. In disposing of this question COLE, C. J., remarks:

" Was it lawful to place these poles in the highway'? The statute authorizes any corporation formed to build and operate telegraph lines or conduct the business of telegraphing to construct and maintain its lines, with all necessary appurtenances, along a public highway. Sec. 1778, S. & B. Ann. Stats. And in *Wisconsin Tel. Co. v. Oshkosh*, 62 Wis. 32, it was held that the statute included telephone companies, although such companies were not specifically mentioned therein. The poles, then, were not unlawful structures in the highway, but were authorized by law to be set therein."

In the *Marshfield Case* we said the section in question authorized the use of the highways of the state by poles and wires, provided they were set so as not to obstruct or incommode the public use thereof. In the *Krueger Case* we held the statute granted no power to use the street except as against the public. Under it the public were foreclosed of the right to object to the poles being in the street, but the lot-owner might pursue his legal remedies.

Several of these cases related to the right to place poles in city streets, and it was assumed that the word "highway" was broad enough to and did cover the streets of a city. That proposition is now disputed by the defendants. We will not pursue their argument. Sec. 4971 is to the effect that in the construction of statutes the word "highway" may be construed to include any road laid out by the authority of any town, city, or village. In view of the course of decisions and the importance of the rights involved, we see no good reason for turning from the position tacitly assumed in the cases noted. We therefore hold that the word "highway," as used in sec. 1778, covers the streets and ways of a city, as well as rural highways. We find support in this conclusion in a recent case in the federal court, construing a somewhat similar statute of Minnesota. *Abbott v. Duluth*, 104 Fed. Rep. 833. A still more recent and extended discussion of the same statute by the supreme court of that state may be found in *Northwestern Tel. Exch. Co. v. Minneapolis*, 86 N. W. Rep. 69, where the same conclusion is reached. The right to construct and maintain poles in city streets is as ample and positive as to build in the country highways, except that it may be subject to stricter police regulations, as will be more fully discussed in a subsequent portion of this opinion.

Not one of the cases referred to can be justified except upon the theory that the statute in question grants to corporations of this kind a franchise,— a special privilege, which

The State ex rel. The Wisconsin Telephone Co. vs. City of Sheboygan.

could not be legally exercised without legislative authority. Under it, great corporations have been organized, vast sums of money have been expended, thousands of miles of poles and wires have been erected, and the systems are being extended until the remotest hamlet in the state may communicate with the business centers with the utmost ease. So far as we are aware, this is the only statute from which the authority and power mentioned arises. It came from the ultimate source of power, the legislature, and passed directly to such organizations as come within its terms.

The trial court reached a somewhat different conclusion. His reasoning runs thus: The right to use the streets is a franchise. No franchise can be enjoyed or held which is not derived from the state. The legislature may delegate to municipal corporations power to make by-laws and ordinances which shall have the force of legislative acts. The charter of the city of *Sheboygan* gives the common council authority to control its streets, to make ordinances for the government and good order of the city and for the benefit of trade and commerce. In the *Marshfield Case*, 102 Wis. 604, this court held that sec. 1778 did not deprive cities of their power of police control over the manner in which the work of such corporations shall be done, or of the power to regulate the location and use of poles and wires in the streets. The city, therefore, having the power to regulate, control, and to prevent the incumbering of certain of its streets in the exercise of a reasonable discretion, when called upon to exercise these powers, or take action as requested by relator's petition, was granting a franchise. Sec. 940*b*, Stats. 1898, provides that no franchise shall be granted by any village board or common council until the application therefor, containing the substance of the privileges asked for, shall be filed with the village or city clerk and be published in the official paper. The relator failed to comply with these requirements, and hence the return states a good defense.

In reaching this conclusion the court failed to keep in mind the distinction between the rights or franchises granted by the state and the power of police control possessed by the city. As we have already seen, the power to exist as a corporation, and to exercise the franchise of the use of highways and streets, as against the public, was already possessed by the relator. The city had no power to add to or detract from it except in the exercise of its police power. The franchise existed by express legislative grant. Its exercise might be controlled only in recognition of its existence, and in conformity with a just and reasonable administration of the police power in the interest of the city and its inhabitants. In a sense, the city was called upon to grant a privilege. It had the power to regulate the use of its streets. It might deem it improper to allow poles to be set along some of the streets included in the proposed extensions. It might designate other streets, and thus exercise a reasonable discretion in the interests of its people. But such privilege was controllable only in harmony with the rights both possessed. In no proper sense was the privilege sought a franchise, within the meaning of sec. 940$b$. The consent of the city was only required or asked in view of its right to regulate. Having that power, it was its plain legal duty, when a plan had been submitted as its ordinance required, to take such action thereon as reason and a proper regard for the interests and legal rights of all concerned would seem to suggest. It was no answer for the city to say, as it did in general terms in its return, that the streets of the city were already incumbered by poles and wires, and that a due regard for the safety and convenience of its people rendered it prudent that a change be made " as soon as possible " in the manner of running wires used for electric purposes from poles to an underground system. If the time had arrived, and the exigencies were such, that such a change

was necessary, it was its duty to act, and to adopt such plan as reason and enlightened judgment might suggest.

In the first case in which this court was ever called upon to consider the reciprocal rights of the company and the city, a line was blazed with accuracy, and has since been followed in all the cases. The charter of Oshkosh contained a provision broader in terms than any contained in defendant's. It gave the common council authority " to regulate, control and *prohibit* the location, laying, use and management of telegraph, telephone and electric light and power wires and poles." In disposing of the question raised, this court said:

"But we do not think this was designed as giving to the municipality absolute authority to exclude such companies altogether from carrying on or operating their business within the corporate limits of the city, but simply to regulate the same, and to prohibit such location in improper places; otherwise the municipalities of the state would have the power to nullify what the legislature had expressly authorized. Undoubtedly, the common council, under the charter, had a right to regulate, in order to guard and secure the public safety and convenience; but their regulations, to be valid, should have been reasonable and fair, and not have gone to the extent of confiscation, nor of wholly excluding the plaintiff from the city." *Wisconsin Tel. Co. v. Oshkosh,* 62 Wis. 32, 40.

The police power possessed by the city, as said in *Chicago, M. & St. P. R. Co. v. Milwaukee,* 97 Wis. 418, extends to the protection of the lives, health, and property of citizens, and to the promotion of good order and good morals. It is not easy of exact definition, or possible to fix upon it exact limitations or restrictions. " It is easier to perceive and realize the existence of this power than to mark its boundaries or to prescribe limits to its exercise." *Comm. v. Alger,* 7 Cush. 53. It arises under what has been termed " the law of overruling necessity." But it has its limitations. Certainly, its exercise must be reasonable and calculated to

promote the ends suggested. *Hayes v. Appleton*, 24 Wis. 544; *Barling v. West*, 29 Wis. 307. Neither the city nor the state can destroy or essentially modify corporate franchises, except as the power is reserved in the original grant or by the constitution. They may regulate the mode of doing business with reference to the comfort, welfare, and safety of society, but cannot, under the pretense of regulating, take away any of the essential rights and privileges which the charter confers.

In the exercise of its police power to control and regulate its streets the city passed an ordinance providing that the location of poles should be subject to the approval of the proper authorities and that the further occupation of its streets should be upon a plan to be approved by the council. This was reasonable, and the relator cannot and does not object to it. In the petition presented to the council it signified its readiness to conform to all reasonable requirements, and, if the plan presented did not meet with approval, it was ready to change the same to meet the wishes of the authorities. But the city seeks to go much further. It, in effect, says to relator: "Before you can make any changes, or extend your system, you must consent to an ordinance fixing rates of charges to patrons. You must consent to sell your privileges at an appraised value in case the city shall desire to purchase. You must consent to the free use by the city of the top thirty inches of all poles for its police and fire-alarm system. In case you shall fail to operate and maintain your exchange, any poles or property in any way used by the city shall become its property. And, finally, if the city shall construct and operate an exchange for the use of its officers and departments, it shall have the right to connect with your exchange, and have the rights, privileges, and service given other subscribers, free of all rental charges." These, in brief, are the conditions insisted upon by the city that shall be accepted by the relator, and are set up in the

return as an excuse for not obeying the writ. The relator insists that the city has no power to impose any such conditions. None of them can be justified unless they can be said to fairly come within the purview of police regulations. The argument in behalf of the city is based entirely upon the power of the city to regulate and remove encroachments on its streets and to regulate trade and commerce. The fixing of maximum charges for use of telephones or service in the city is said to be a lawful police regulation to prevent extortion. This is based upon the assumption that the power of police control possessed by the city is unlimited. Such is not the fact. *Such power* is inherent in the state, and is a necessary attribute of sovereignty. It does not pass to the minor divisions of government except by express grant or by necessary implication from other powers granted. Every citizen holds his property subject to the proper exercise of this power either by the state legislature directly or by public or municipal corporations to which the legislature may delegate it. 1 Dillon, Mun. Corp. § 141. Speaking on the general proposition, the same learned author states the rule thus:

"It is a general and undisputed proposition of law that a municipal corporation possesses and can exercise the following powers, and no others: First, those granted in express words; second, those necessarily or fairly implied in or incident to the powers expressly granted; third, those essential to the declared objects and purposes of the corporation,— not simply convenient, but indispensable. Any fair, reasonable doubt concerning the existence of power is resolved by the courts against the corporation, and the power is denied." Sec. 89.

That rule has been substantially adopted and approved in this state. *Hayes v. Appleton*, 24 Wis. 542; *Gilman v. Milwaukee*, 61 Wis. 588; *Bell v. Platteville*, 71 Wis. 139; *Kilvington v. Superior*, 83 Wis. 222; *Becker v. La Crosse*, 99 Wis. 414. Whatever power a municipality possesses over

the wires and poles of a telephone company in its streets must be granted it by the legislature. 2 Dillon, Mun. Corp. § 698. The charter of the city of *Sheboygan* empowers it to enact proper ordinances and regulations for the government and good order of the city, for the benefit of trade and commerce, for the suppression of vice and the prevention of crime, to prevent the incumbering of streets, to provide for the removal of obstructions therein, to regulate the manner of using streets, and to protect them from injury. As we have already seen, this grant of power does not authorize the city to wholly prevent the relator from doing business within its limits. No express authority is given the city to regulate charges for telephone service, nor is there any express grant of power from which such authority can necessarily be implied. Construing the charter and the statute in the light of the rules of law stated, the city has authority to exercise its police power to protect the public from unnecessary obstructions, inconvenience, and danger, and to determine in what manner the relator may erect its poles so as to accomplish this result. *Michigan T. Co. v. Benton Harbor*, 121 Mich. 512. It has no authority to impose other conditions. That power rests in the legislature. The power to regulate charges was not included in or incidental to the power to regulate the manner of using streets. There is not the remotest relation between them. The attempt of the city to justify its position on that ground must fail. *St. Louis v. Bell T. Co.* 96 Mo. 623. The case of *Allegheny v. Millville, E. & S. St. R. Co.* 159 Pa. St. 411, cited by defendants, has no application here. It was based upon the ground that under the constitution of Pennsylvania no street railway shall be constructed within the limits of a city without the consent of the local authorities. For that reason the imposition of a condition regulating rates of fare was justified. Neither does the power come to the city under the general authority to pass ordinances for the government and good order

of the city and for the benefit of trade and commerce.  To say that under this general power the city may fix rates for telephone service would be going entirely too far.  The charter otherwise points out the cases in which the city may exact licenses and fix rates, and any attempt to extend the power would be running directly in the face of the rule laid down by this court in the *Oshkosh Case*, 62 Wis. 32.

What has been said applies with almost equal force to the other conditions insisted on by the city.  We do not see how, under the power it now possesses, the city can rightfully withhold action, or base affirmative action on the condition of financial benefits to itself.  Such contention must rest largely upon the supposed exercise of power to grant or refuse the right to use the streets.  This, of course, the city has no right to do except when the situation is brought within the rule stated in the *Marshfield Case*, 102 Wis. 604.  We need not repeat what was there said relative to the right of the city to prohibit the erection of poles on certain of its streets.  Such right must be exercised in the light of reason; not with a view of prohibiting the company doing business in any given locality, but reasonably to protect the public against unnecessary obstructions, inconvenience, and dangers, for the general welfare and common protection of all.  The right to purchase relator's exchange, if granted, would be a contract right of great value.  So, also, as to the right to use the tops of the poles for the fire-alarm system, and the agreement as to forfeiture of property to the city in case of nonuse.  Such rights have no relation to the legitimate exercise of the power of police regulation.  To permit the city to base its action upon considerations of financial benefit to itself would be allowing it to put its powers up for sale to the highest bidder.  Nothing could be more vicious.  Very soon the interest of the public would be at the mercy of local boards.  The company willing to yield the greatest number of privileges or pay the most money would get the

greatest favors. The embarrassments growing out of a recognition of the existence of this right are so manifest and so manifold that we need spend no time in discussing them. We say without hesitation that the city has no right to barter with the police power, or exact for itself financial benefits as a condition for its exercise. Such power must be exercised for the public good and public welfare, and not for public gain.

The further contention that the city may refuse action on the ground that ruinous competition in telephone rates would result, cannot be sustained. The city has no express or implied power to legislate on this subject. Its power to regulate trade and commerce does not extend to controlling competition. Such power as it possesses must be exercised within the lines already suggested, and cannot be extended to cover municipal fears, or to control mere matters of local competition. The course followed by the relator is substantially that mapped out by this court in the *Marshfield Case*. It presented its petition with a plan of its proposed improvements and extensions. It signified its willingness to submit to such changes as were deemed for the best interest of the city. It then became the duty of the city to take affirmative action. What that action should be the court has no power to declare. It can only say "*Act*, and let such action be in harmony with the powers granted in the charter as herein construed."

Considering the return as a whole, we do not think it presents any question of fact for trial, or any legal justification for failing to obey the commands of the writ.

*By the Court.*— The order appealed from is reversed, and the cause is remanded with directions to sustain the demurrer to the return and for further proceedings according to law.