LE FEBER and others, Appellants, vs. VILLAGE OF WEST
ALLIS and others, Respondents.

*October 26—November 17, 1903.*

*Municipal corporations: Ordinance, when void for unreasonableness:
Lighting contract.*

1. Though broad scope and great deference will be accorded to the
   discretion of municipal corporations in the exercise of the leg-
   islative powers granted to them, yet such powers, being dele-
   gated solely for public purposes, must be exercised with ref-
   erence to such purposes, and acts which in that aspect are
   wholly unreasonable will be held invalid.
2. A village ordinance conferring franchises upon and making a
   contract with a corporation bound the village and its munic-
   ipal successors for a term of thirty years (and practically for
   fifty years) to take all its lights from the corporation and pay
   for them during the whole period at rates definitely fixed
   therein, which considerably exceeded prices paid elsewhere
   under similar circumstances. The greatest excess was in the.
   prices for gasoline and oil lamps, which were practically the
   only lights which the corporation was bound to furnish, there
   being no provision under which the village could compel the
   laying of gas pipes or stretching of electric wires. The only
   reservation of any power of control in the village was of "such
   rights as it cannot waive" to make ordinances and regulations.
   There were other provisions significant of a purpose merely to
   benefit the corporation, without consideration for the public
   welfare. The village had a population sufficient to make it a
   city *ipso facto* when the fact should be ascertained by a census.
   It almost immediately adjoined the city of Milwaukee, and
   the speedy extension to it of the gas and electrical facilities
   of that city was beyond reasonable doubt. *Held*, that the ordi-
   nance was invalid.
3. The fact that the ordinance had been submitted to and approved
   by a vote of the electors of the village, so that it was the duty
   of the village board, under sec. 959—52, Stats. 1898, to grant
   the franchise, does not prevent the ordinance from being held
   void for unreasonableness.
4. The unreasonable features of such ordinance and the other por-
   tions thereof are so interdependent that the whole must be
   held void.

APPEAL from a judgment of the circuit court for Milwaukee county: WARREN D. TARRANT, Circuit Judge. *Reversed.*

The village of *West Allis* was incorporated June 30, 1902, out of what was formerly agricultural territory taken from the towns of Greenfield and Wauwatosa, and from one to two miles west of the limits of the city of Milwaukee, where had just been located several large manufacturing plants, which had drawn to themselves a considerable settlement, so that by February, 1903, the population amounted to about 1,800. After certain preliminary steps, including an attempted advertisement for proposals and a special election, the village board enacted an ordinance conferring certain franchises upon, and entering into contract with, the *Northwestern Heat, Light & Power Company,* a corporation. That ordinance first conferred upon the company, for the absolute term of thirty years, permission to construct and maintain plant, system, and all necessary equipment and appliances for manufacturing gas and electricity, and selling, furnishing, and distributing to the village and its citizens heat, light, and power by means of electricity, gas, oil, naphtha, gasoline, and acetylene, from plants either within or without the village, and to that end to enter upon all streets and public grounds and use the same for the purpose of conducting, constructing, maintaining, repairing, enlarging, extending, and operating its plants, systems, and business, and generally for the distribution of the authorized light and power; to use any conductors, conduits, etc., of the village, or of any other person or corporation then or thereafter placed in the village, by paying reasonable compensation therefor. The ordinance further provided that, as the village was not at present lighted with gas, the company was given the exclusive right to manufacture and sell gas for light and lay gas pipes within said village, for a period of fifteen years from the date of the ordinance. It was further declared "that all of the rights, permission, and authority given and granted in

this ordinance shall be limited in every respect to the right of said village board so to give and grant in each case." The only provisions in the ordinance regulating the manner of conducting the grantee's business were the following:

"All of the company's posts, poles, wires, and other appliances and equipments shall be reasonably strong and shall be placed and excavations shall be made in such a manner as not to unreasonably impede public travel in public places, and all public places shall be left in otherwise as good condition as at the time of the commencement of the work done at the places in question; and subject to such rights of such village as it can not waive to make reasonable ordinances, rules, and regulations in connection with the exercise and enjoyment of such rights, permission, and authority."

The company bound itself to sell and furnish and keep supplied said village, citizens, persons, and institutions with light

"by said six mentioned means, and any, either or all of them, as hereinafter provided, but with gas and electric light only upon and along those parts of the highways where gas-mains are laid at the time or poles erected and wires strung for the conveyance of electricity, respectively, and to the premises adjoining the highways at such places."

No provision was made requiring the company to lay mains or erect poles and wires, except that:

"the construction of said plant or system or active work in furnishing such heat, light, and power as provided herein, shall be begun within five months from the date of the acceptance of this ordinance by such company, and if such construction or active work is not begun within such five months, then this ordinance shall be null and void."

The village, in consideration of such obligations by the company, contracted and agreed to pay it for light, and also permitted the charge for private lights at rates specified, to wit: $120 a year for each 1,600 candle power arc light, up to fifty, and upon a sliding scale in case of larger number, extending to $95 per year if more than 500 such lights were

used; for gas street lamps, nominally seventeen candle power at works, $36 a year for each light; for oil, naphtha, and gasoline street lights, "of usual strength in such cases," $45 a year for each light; and for incandescent electric lights, nominally sixteen or thirty-two candle power, twenty cents per 1,000 watts, meter measurement. A deduction of ten per cent. from said various prices to be made in case lights burned only till 12 o'clock, and none but *pro rata* deductions to be made for outage of any street lights. The charge for gas, other than street lights, to be at $1.50 per 1,000 cubic feet, with a discount of twenty cents for prompt payment. The company was given power to make regulations as to the method of application by private consumers, the installation and reading of meters, collections, deposits of security by consumers, and

"such other and further usual and customary rules and regulations as to its laying pipes, gasfitting, wiring, inspection by the company, and the like, as may be necessary or convenient in conducting its said business and protecting itself against loss, as long as the same shall be reasonable, not contrary to law, and not beyond the power of said village to permit. Said village shall pass all needful lawful ordinances for the protection of said lighting system."

The village bound itself to all these requirements for the term of thirty years, and that during that period it would use continuously not less than twenty-five all-night electric arc lights, five naphtha lights, five incandescent lights, and "all other lights used by said village for public purposes during said thirty years shall be purchased by said village from said company." It was further provided that, at any time during the four months immediately preceding the expiration of the thirty years, the village should have the option to purchase from the company the said lighting plant and system, upon giving written notice within such four months of the intention so to do, at a price to be agreed upon, and, if

a price cannot be agreed upon, then one to be fixed by arbitrators, one to be selected by the village, one by the company, and the third by the two thus selected.

"If said village or municipality shall fail during said four months to purchase as aforesaid, then the rights, permission and authority and the contract features of this ordinance . . . shall be deemed extended and shall continue to remain in full force and effect for a further term of twenty years, under the same terms and conditions, except in this: that the said company shall, as a further consideration for such extensions, make a general ten per cent. reduction of the rate to said village from said company, in force during the first fifteen years from the date hereof, for gas, electricity, oil, naphtha, gasoline and acetylene, as sold to said village."

The company was to give a penal bond of $5,000 for faithful compliance on its part with the terms of the ordinance. Such ordinance, upon signature by the president and clerk of the village and by the company, was to become a contract. It was so signed on or about February 16, 1903.

The plaintiffs and appellants, describing themselves as residents and taxpayers of the village, brought this action on the 24th day of February, 1903, praying that the contract embodied in said ordinance be adjudged void, and that the village, its officers, and the company be enjoined from carrying out the same or creating any liability against the village or making any payment under it. The case was tried to the court without a jury, and a so-called "finding" filed, declaring, first, that the allegations of the complaint, except so far as admitted by the answers of the defendants, are not sustained by the evidence; and, second, that the allegations of the answers of said defendants are substantially correct and true; whereupon judgment was rendered dismissing the complaint, from which the plaintiffs bring this appeal.

For the appellants there was a brief by *Edgar L. Wood,*

attorney, and *Quarles, Spence & Quarles,* of counsel, and oral argument by *Mr. Wood* and *Mr. T. W. Spence.*

For the respondents there was a brief by *Winkler, Flanders, Smith, Bottum & Vilas,* and oral argument by *F. H. Remington* and *J. G. Flanders.* To the point that it is the policy of the law to invest the municipal authorities in such cases with very broad discretion, which the courts will not undertake to control except in case of the grossest and most palpable abuse, they cited *Atlantic City W. W. Co. v. Atlantic City,* 48 N. J. Law, 378; *Houston v. Houston City St. R. Co.* 83 Tex. 551, 19 S. W. 127; *Illinois T. & S. Bank v. Arkansas City,* 76 Fed. 271, 34 L. R. A. 525

Dodge, J. It is perfectly well settled in this state, as in most others, that municipal corporations are not completely beyond judicial review and control, even in the exercise of the jurisdiction and discretion delegated to them by the legislature. True, that discretion must and will be accorded broad scope and great deference. The honest judgment of the municipal authorities as to what is promotive of the public welfare must ordinarily control, although not in accord with the views of courts. Nevertheless the delegation of legislative power to subordinate political divisions of the state is solely for public purposes, and must be exercised with reference to them. If an act be so remote from every such purpose that no relation thereto can, within human reason, be discovered, such act must be deemed excluded from the delegation. To that extent, then, courts will inquire into the purpose and policy of municipal conduct, and will hold unauthorized, and invalid, acts which are wholly unreasonable. *Hayes v. Appleton,* 24 Wis. 542; *Barling v. West,* 29 Wis. 307, 315; *Clason v. Milwaukee,* 30 Wis. 316; *Cook v. Racine,* 49 Wis. 243, 5 N. W. 352; *Atkinson v. Goodrich T. Co.* 60 Wis. 141, 160, 18 N. W. 764; *Stafford v. C. V. E.*

*R. Co.* 110 Wis. 331, 351, 85 N. W. 1036; *State ex rel. Wis. Tel. Co. v. Sheboygan,* 111 Wis. 23, 37, 86 N. W. 657; *Hurley W. Co. v. Vaughn,* 115 Wis. 470, 476, 91 N. W. 971; *State Center v. Barenstein,* 66 Iowa, 249, 23 N. W. 652; *Hall v. Cedar Rapids,* 115 Iowa, 199, 88 N. W. 448; *Flynn v. Little Falls E. & W. Co.* 74 Minn. 180, 77 N. W. 38, 78 N. W. 106; *State ex rel. Att'y Gen. v. Cincinnati G. L. & C. Co.* 18 Ohio St. 262, 301; *Chicago v. Rumpff,* 45 Ill. 90, 96; *Davenport v. Kleinschmidt,* 6 Mont. 502, 533, 13 Pac. 249; *Lamar v. Weidman,* 57 Mo. App. 507, 510; Dillon, Mun. Corp. §§ 97, 311, 443.

The ordinance before us is assailed as thus unreasonable. Most prominent among the elements claimed to render it so is the extraordinary term, of thirty years certainly and fifty years contingently, through which the village and its municipal successors are bound under its terms to take all its lights from this company and pay for them at rates now definitely fixed. That a term of thirty years in a contract for water supply is not under all circumstances sufficient alone to invalidate the contract as unreasonable is a proposition now settled. *Oconto W. S. Co. v. Oconto,* 105 Wis. 76, 80 N. W. 1113; *Hurley W. Co. v. Vaughn,* 115 Wis. 470, 91 N. W. 971. This is the extent, however, to which this court has gone, and thirty-one years seems to be the longest period sustained in any cited case. *Reed v. Anoka,* 85 Minn. 294, 88 N. W. 981. On the other hand, much shorter terms of contract, either for other service than water supply or complicated by other elements, have been held unreasonable. The considerations which in the *Oconto Case, supra,* were deemed sufficient to warrant a thirty-year contract for water, namely, magnitude of investment and time required to develop private consumption to the profit-producing point, apply, though in less degree, to a gas-lighting contract, in greatly diminished degree to the supply of electric lights, but hardly at all to supply of naphtha or oil street lights,

where no outlay for plant is required. Hence a term of contract for any of these forms of lighting might well be unreasonable, though sustainable in a water-supply contract. Further, we cannot deem the contract period in the present ordinance other than fifty years. The contingency upon which the village may limit it to thirty years is so restricted as to be hardly worthy of mention. The practical possibility of securing municipal action or effecting fiscal arrangements during a four-months period, not to occur till thirty years hence, is slight. The opportunity for the company to refuse to agree on price, and to render practically ineffectual the provisions for arbitration by selecting as its member of the board one who may refuse assent to any impartial third member, is obvious.

A further very obvious and cogent consideration consists in the difference between the situation of *West Allis* and that of either Oconto or Hurley. Both the latter were, and were likely to remain, individual and independent communities, with no opportunity to obtain water or light from plants established elsewhere, and with prospects of but normal municipal growth and development. *West Allis* was in practical effect a part of the urban development of Milwaukee, though outside its limits. Its existence was due to the already accomplished fact of the location of vast factories as part of the business and manufacturing aggregation pertaining to the metropolis. Its streets were laid out in continuation and extension of the system already existing in Milwaukee. The electric street car lines of that city already traversed the new village. Its proximity was such that speedy extension to it of the gas and electrical facilities existing in the city was beyond reasonable doubt.

Yet further, the legislature has established, as to cities, ten years as the limit permissible for lighting contracts. Subd. 34, sec. 925—52, Stats. 1898. The evidence made apparent that *West Allis,* at the time of this contract, had

already attained population more than sufficient to make it a city *ipso facto,* though that fact could not be effectively established until a state census should be taken. Sec. 925*g,* Stats. 1898. While legally a village, so that the absolute legislative limitation on cities did not apply, yet obviously all the reasons which induced such legislative limit are cogent as reasons why it ought not to be exceeded by this village. All these distinctions render it obvious that the two Wisconsin cases above cited can have no controlling effect as to the reasonableness of the time limit in this contract, even if that were the only extraordinary element therein.

That a fifty-year term, even for gas lighting, is extraordinary and far in excess of any sustained by authority, we have already said; also that the situation was such as to make specially unnecessary any extraordinary and special provision for lighting plant; but whether any mere length of time alone must force conclusion of unreason we need not decide; that element is certainly one which, with others, must have effect, though insufficient alone. One such additional element was the price agreed to be paid throughout the term. Without going into detail of the evidence, it is apparent that such prices considerably exceeded those elsewhere paid under substantially similar circumstances; electric arc lights by thirty per cent. to fifty per cent., gas lights by twenty-five per cent., and gasoline lights by seventy-five per cent. These excessive prices for so long a term were rendered the more unreasonable by, the probability, already mentioned, that the gas and electric lighting facilities of Milwaukee would speedily be extended to this village, with prices lower than those with which the above comparisons are made. Also, it is striking that the greatest excess in price was upon the gasoline lights, with which the village might in the main be forced to content itself at the will of the company, as we shall presently demonstrate. These, of course, might be supplied by any one without large preliminary investment, and

present none of the reasons for long-term contract or large price which might be urged in favor of gas or electric lighting, for which expensive plant must be provided.

Not the least striking characteristic of this ordinance is its omission of all the ordinary reservations to the village of power to control the manner of its performance in those respects in which time and circumstances must make wise provision in advance impossible; also the absence of any binding contract on the part of the company to furnish lights of the kinds and at places which public welfare may demand. The only reservation of any power of control in the village is of "such rights as it cannot waive" to make ordinances and regulations. This is, of course, a most extraordinary provision, utterly needless and meaningless in a contract, and no adequate substitute for those reservations usually so industriously made in franchises and contracts of this sort. Further, the company is given power to make all regulations in its discretion, some of which may be very burdensome alike to the village and to the private consumers, with only the limitation that they shall be reasonable and not contrary to law and not beyond the power of said village to permit. A more complete surrender by a village of its power to protect the public welfare in the important matter of street lighting can hardly be imagined.

As to the agreement of the company to supply lights, it is substantially without force except as to gasoline or oil lamps. The agreement is in terms to keep the village and its citizens supplied with light by the six mentioned means and any or all of them. This, perhaps, would give option to the city, and might enable it, to compel the supply of gas and electric light at places where necessary; but it is at once qualified by the limitation that such supply shall be with gas and electric light only upon and along those parts of the highways where gas mains are laid at the time, or poles erected and wires strung. We search the contract in vain for any power in the

city to compel the company to lay its pipe or stretch its wires. at any specific place or to any specified extent. The only burden in the latter respect assumed by the company is that it shall commence the construction of its plant and active work in furnishing light within five months from the day of acceptance of the ordinance. As to when such construction shall be completed, the ordinance is silent, as also as to what shall constitute such completion. Even if this may require that either an electric or a gas plant be established, there is nothing here to require the laying of even a single block of gas pipe or the stretching of a single block of wire. Certainly, when the company shall have gone to even that extent, it will have satisfied every term of the contract. The rest of the village, if lighted at all, must be lighted with oil or gasoline, at prices, as we have said, seventy-five per cent. above those charged elsewhere, and with an absolute restriction upon the village against purchasing from any one else even this temporary form of light. The result is that this village has bound itself for fifty years to buy oil or naphtha lights from this company at a grossly excessive price, presumably so profitable as to remove the motive of self-interest which perhaps might otherwise be relied on to induce extension of gas mains and electric wires sufficiently to meet the most pressing public needs. Thus the village may never within that term be able to obtain, except to the most trifling extent, any of the modern forms of street lights, for it can buy them of no one else.

We have perhaps carried the detailed analysis of this ordinance further than was necessary, and may end it here, although there are various other phrases, clauses, and provisions of the contract most significant of a result or purpose to merely benefit the company, without thought or consideration for the public welfare. We cannot avoid the conviction that the terms of this ordinance and contract bring it within

that degree of unreasonableness which, after yielding all due deference to the discretion vested in the municipality, compels us to say that that body has transcended the powers delegated to it by the legislature, and that its act in passing this ordinance and entering into this alleged contract is void for that reason.

Some contention is made that because the legislature requires the village board to grant a franchise when, upon submission to popular vote, the majority of the votes have been in the affirmative (sec. 959—52), the doing of such act is no longer discretionary with the village board, but is in effect the act of the legislature, and therefore cannot be reviewed by the courts as to its reasonableness. This argument confuses the municipal corporation with the village board. It is not alone the acts of one or another of the several village officers which are subject to review for unreason by the judiciary, but the act of the corporation itself, which is also a mere delegate of certain powers, which it must exercise within such delegation. Now, the electorate of this village, in special election assembled, is none the less an agency of the municipality than is the village board or any of the village officers, within their respective jurisdictions. True, the electorate comes nearer to the whole people of the village, who are the corporation, but it does not constitute the whole. It may speak for and bind the whole only within the limits of the authority conferred upon it, just as can the village board or any other officer. No authority is cited for the proposition that, because the village acts in some other way than through its village board, its acts, however unreasonable, are beyond revision and correction by the judiciary, and no reason presents itself to our minds in favor of such view. This ordinance, if unreasonable, is as much void when approved by a certain number of the electors as if the village had acted through any other of its authorized agencies, though doubt-

less the assent of so large a part of the community would be
recognized by the courts as a cogent circumstance in support
of the reasonableness of an ordinance.

It is further urged that although we might find this ordi-
nance unreasonable and therefore illegal in certain respects—
as, for example, in its length of time—we should restrict
the invalidity to those elements, leaving valid the other por-
tions.   It is hardly necessary, after the discussion of the
grounds of the invalidity of this ordinance, to say that they
so permeate the whole and are so obviously interdependent,
and the consideration, either to the village or to the company,
for all the provisions thereof, that no such severance is pos-
sible.   We cannot, for example, eliminate one half of the
price for gasoline lamps and say that the ordinance and con-
tract shall stand valid as against the company at such dimin-
ished price; nor can we supply in the contract an agreement
by the company to supply lights of different kinds, as the vil-
lage government may deem public welfare to demand in the
future.   Hence we can find no escape in this contention from
the conclusion of complete invalidity.

Many other grounds for invalidating the ordinance in
question are asserted and have been vigorously argued, but,
as complete invalidity results from the considerations al-
ready stated, discussion and decision of the others would be
needless expenditure of labor.   We therefore do not pass
upon them.

*By the Court.*—Judgment reversed, and cause remanded
with directions to render judgment in favor of the plaintiffs
according to the prayer of the complaint.