### STATE ex rel. CHARLES P. JOHNSON and Another v. DAN C. BROWN.[1]

May 13, 1910.

Nos. 16,092—(33).

**Minneapolis park commission — house for superintendent.**
> The board of park commissioners of the city of Minneapolis has the power to erect a dwelling house upon park property, to be used by the park superintendent and by his family as a residence, and to be further used as an office by the park superintendent and his associates.

Upon the relation of Charles B. Johnson and Carl Johnson an alternative writ of mandamus issued from the district court for Hennepin county requiring respondent Brown, as city comptroller of the city of Minneapolis, to countersign a contract between the city of Minneapolis and relators for the erection of a dwelling house to be used by the superintendent of parks of that city, or show cause why he had not done so. Respondent's answer was that he was advised by counsel that the contract in question was illegal, in that the park board had not authority to contract for the erection of a residence for the superintendent of parks, either as an official of the board, as one of its employees, or as a private individual.

[1]Reported in 126 N. W. 408.

The facts were stipulated.   It was agreed, inter alia, that the building was planned as an ordinary residence of about ten rooms, excepting that, in connection with and as a part of the basement floor the plans embraced an office and drafting room of the aggregate dimensions of about 39 feet by 13½ feet; "that said office and drafting room are designed to be used by the superintendent of parks and those employed under him in the administration of the park system of the city of Minneapolis, and that the remainder of the building is designed to be used as a residence of the superintendent of parks and his family; that the aggregate cost of the building is admitted to be $10,000, and that the cost of such building without the office and drafting room would be in the neighborhood of $9,000."   It was also admitted that the area, cost and value of the parks and parkways owned and controlled by the board of park commissioners, and the receipts and disbursements for the year 1909, are as shown herewith, to wit:

| | |
|---|---|
| Total value of land purchased and donated, and improvements | $5,282,568.53 |
| Total area of parks and parkways | 3,379.138 acres |
| Length of drives in parks and parkways | 31.64 miles |
| Total receipts from taxes and assessments | $245,272.48 |
| from sale of city bonds | 203,638.00 |
| from miscellaneous collections | 122,259.61 |
| | |
| Total receipts for the year 1909 | $571,170.09 |
| | |
| Total disbursements for betterments | $198,726.59 |
| for maintenance | 172,721.20 |
| for interest, etc. | 105,352.92 |
| | |
| Total disbursements for the year 1909 | $476,800.71 |

The matter was submitted to Holt, J., who granted respondent's motion for judgment in his favor upon the pleadings and stipu-

111 M.—6.

lation and dismissed the respondent with his costs and disbursements. From that order, relators appealed. Reversed.

*Ira C. Peterson,* for appellants.

*Willoughby M. Babcock,* for respondent.

*C. J. Rockwood,* for board of park commissioners, filed a brief with consent of both parties.

JAGGARD, J.

The only question in the case is whether or not the board of park commissioners of the city of Minneapolis has the power to erect upon park property a dwelling house, which is to be used by the park superintendent and his family as a residence, and as an office by the park superintendent and his associates. The relevant provision of the city charter is section 2 of the park board act approved March 11, 1909. It is as follows:

"The board of park commissioners of the city of Minneapolis and its successors shall have the power, and it shall be its duty, to devise, adopt and maintain parks and parkways in and adjacent to the city of Minneapolis, and from time to time to add thereto; to designate lands and grounds to be used and appropriated for such purposes; to cause the same to be platted, surveyed, and plats thereof filed in the office of the secretary of said board, and in the office of the city engineer of the city of Minneapolis, and the right to take possession, upon obtaining title to the same or any part thereof; *to hold, improve, govern and administer* the same for such purposes." (The italics are ours.)

It is to be noted that this is a statement of general powers, and not an enumeration of particular powers, which would naturally exclude others not set forth. The board, therefore, had these general powers and such powers as would be reasonably implied therefrom. It is evident that on an extremely liberal construction of these powers the erection of the proposed building would be unquestionably justified. On an extremely strict and literal construction it may not be impossible that such erection would not have been authorized. But on a reasonably strict construction we think that the park board had the power to contract for the erection of such a building, and that

the city comptroller of the city of Minneapolis should have counter-signed the contract as provided by chapter 374, Laws 1909 (R. L. Supp. 1909, §§ 765—29 to 765—31).

It is clearly within the implied powers of the park board to erect on its property pavilions, boathouses, workshops, stables, greenhouses, storehouses, an administrative building, and the like. It is within the discretion of the board whether it should combine with the administrative building a superintendent's residence. Usually parks are situated at some distance from the city. It may, then, be necessary to provide the superintendent with a residence within the limits of the park. Even if such a residence be not ab-solutely necessary under the circumstances here presented, it is very reasonable that he should be on the ground, where he can see to it that park property is properly used for park purposes. His residence there would naturally conduce to conserve the improvements on the premises, to the proper government of the park, and to the proper administration of the trust. As a result there would constantly be some one in authority always accessible, and all matters properly related to disciplinary and administrative affairs could be attended to as promptly as possible. The proposed building may fairly have been regarded as practically necessary.

It is, however, urged upon us that a city engineer, or an engineer of city sewers, supervises and controls a much larger mileage of streets than the park board of parkways, and that these departments are compelled to keep track of as many or more tools. Why, it is naturally asked, should not the city provide a residence for such an officer, or for the chief of police? This question is not before us, and it would be entirely improper to undertake to here decide what the city might not legally do under such circumstances. The func-tions and the jurisdictions of the various officers are so obviously different that the reasoning on their respective powers has not much cogency. But if a county can properly provide a residence for a sheriff, why not a city for its chief of police? It is common in all charitable and penal institutions for the superintendent to reside on the premises. It is true that in many cases special statutory or charter provisions justify the furnishing of such residences. Often,

however, the provision is substantially the same as the provision at bar. The fact is significant, however, and indicative of a true public policy.

The question is one of reasonable discretion on the part of the park board. Its conclusions must be sustained, unless they appear to be arbitrary, or the result of fraud or demonstrable mistake of fact. See Diamond v. City of Mankato, 89 Minn. 48, 93 N. W. 911, 61 L. R. A. 448; Le Feber v. West Allis, 119 Wis. 608, 613, 97 N. W. 203, 100 Am. St. 917; State v. State Medical Examining Board, 32 Minn. 324, 20 N. W. 238, 50 Am. Rep. 575; State v. Powers, 69 Minn. 429, 72 N. W. 705; State v. Teal, 72 Minn. 37, 74 N. W. 1024; State v. Copeland, 74 Minn. 371, 77 N. W. 221. We find nothing to disturb this conclusion in the cases to which respondent refers us. Borough of Henderson v. County of Sibley, 28 Minn. 519, 11 N. W. 91; Bates v. Bassett, 60 Vt. 530, 15 Atl. 200, 1 L. R. A. 166; Spaulding v. City, 23 Pick. 71, 80; Sherlock v. Village, 68 Ill. 530.

Reversed.

BROWN, J. (dissenting).

I dissent. Whether the cities and villages of the state should be clothed with the power and authority to construct dwelling houses for their officers and servants at the expense of the taxpayer is a question for the legislature to determine, and in language too clear to admit of doubt, and not by the court through a forced construction of their express charter powers. In this case it is not claimed that any such authority has ever been expressly conferred upon the city of Minneapolis, but my brethren do insist that it arises by implication and as an incident to the express power to purchase, hold, and manage public parks, under which it is held that a dwelling for the use and occupancy by the superintendent of parks may be constructed at public expense. I am unable to concur in the proposition that such power exists by implication.

Charter powers of municipal corporations are strictly construed, and the rule of strict construction is no better illustrated than by our own decisions. State v. Bruckhauser, 26 Minn. 301, 3 N. W.

695; State v. Hammond, 40 Minn. 43, 41 N. W. 243; City of St. Paul v. Stoltz, 33 Minn. 233, 22 N. W. 634; City of Red Wing v. Chicago, M. & St. P. Ry. Co., 72 Minn. 240, 75 N. W. 223, 71 Am. St. 482. The implied powers of a municipal corporation are those, and those only, which are necessary, not merely convenient or proper, to enable the corporation to exercise either its inherent or express powers. The whole law on this subject is correctly summed up by Chief Justice Baldwin in the case of Crofut v. City, 65 Conn. 294, 32 Atl. 365, as follows:

"The powers expressly granted to a municipal corporation carry with them such other powers as are necessarily implied in or incidental to such grants. And it also possesses all powers which are indispensable to the attainment and maintenance of its disclosed objects and purposes. Municipal corporations are more strictly limited in these respects than private corporations. *The test of their right by implication to exercise any particular power* is the *necessity* of such power, not its convenience. If there be reasonable doubt as to its existence it does not exist." See also Von Schmidt v. Widber, 105 Cal. 151, 38 Pac. 682; 28 Cyc. 262.

In my judgment the construction of a private dwelling for the superintendent thereof is not necessary to the exercise of the power to own, hold, and manage a public park.

I therefore respectfully dissent.