## JOSEPH SHERLOCK *et al.*

*v.*

## THE VILLAGE OF WINNETKA.

1. TAXATION—*power of village council to reduce assessment.* The constitution of 1848 provides that taxes shall be levied on a valuation of property, to be ascertained by some person or persons, to be elected or appointed in such manner as the General Assembly shall direct, and not otherwise. Under this, the assessor of a village has the sole power to ascertain and fix the value of the property for taxation, and where no power of review is conferred upon the village council, they will have no power to alter, change or correct the assessment as made by the assessor.

2. SAME—*uniformity.* To secure the uniformity in taxation required by the constitution, two things are essential: *First,* the assessment must be just and equal, in proportion to the value of the property liable to assessment, and, *second,* when thus assessed, the rate shall be uniform to every person and on every species of property returned by the assessor. The constitution requires that the uniform value shall be ascertained by one officer, and the uniform rate imposed by a different set of officers, or a different person.

3. The abatement of the assessment of property, liable to taxation, by a village council, where no power of review is conferred, destroys the equality and uniformity of the assessment, and will, no doubt, authorize the tax-payers injured thereby to enforce their rights by legal remedy against the council; but however wrong and unauthorized, it can not afford grounds for holding the whole assessment invalid.

4. MUNICIPAL BONDS—*place of payment.* Municipal authorities, in the absence of express statutory authority, have no right to make their bonds, issued by them, payable at any other place than their treasury; but if they are made payable at some other place, this will not invalidate the bonds—the provision to pay at some other place being void.

5. MUNICIPAL CORPORATION—*charter construed as to erecting school buildings.* Charter authority to a village council, as a board of education, to purchase grounds, erect buildings, borrow money to establish a school of a high grade, and levy taxes for the erection and support of the same, *held,* not to authorize the conveyance, or leasing of the buildings when completed, without pay or rent, to an individual or private corporation, for the purpose of having a school taught therein for pay. The school contemplated was one free to the use of all children of suitable age and advancement who resided in the district, and any thing else was a perversion of the property from the uses intended by the charter; but such perversion does not render void the bonds legally issued for the purchase of the ground, and the erection of the school buildings.

6. SAME—*enjoining issue of bonds for unlawful purpose.* Although bonds issued by a board of education, under a law, for a proper purpose, are valid in the hands of innocent holders for value, notwithstanding the uses for which they were intended have been perverted, yet if a bill had been filed, showing an intended perversion, or that the buildings to be erected with their proceeds would be perverted, the board would have been enjoined from putting them into circulation.

7. SAME—*bonds to build dormitory and boarding house.* Where a board of education had issued and sold bonds of the district, and with the proceeds erected school buildings, as contemplated by a special act of the legislature, afterwards issued and sold other bonds for the purpose of building a dormitory and boarding house: *Held,* that the latter bonds were issued without any authority of law, as such latter buildings were in no sense necessary and proper for a public free school, and their action not being merely an abuse of power, but without authority of law, the bonds were illegal, and there existed no power to levy taxes to pay the interest on the same.

8. USURY—*sale of bonds below par.* Where corporate authorities were authorized to borrow money for a certain purpose, they being limited in the interest to ten per cent per annum, and they sold their bonds, bearing ten per cent interest, at ninety-five cents on their face, and after ten months interest had accrued: *Held,* that this was an abuse of the power conferred, for which the authorities were probably personally liable, and that the bonds were usurious in the hands of the original purchasers, yet that it did not render the bonds invalid.

9. OFFICIAL TRUST—*right to purchase at his own sale.* A member of a village council has no power to purchase bonds of the corporation he represents, at any sale made by himself, or by the body of which he is a member, and if he does, a tax levied to pay interest on the same may be enjoined at the suit of the tax-payer.

10. MUNICIPAL CORPORATION—*powers of officers limited by charter.* Members of a village council, who are also made a board of education,

can only exercise the powers conferred expressly or by implication. They may do such things as may be necessary to effectuate the purposes of the creation of the body of which they are officers. But they have not an unlimited discretion, but must look to the law creating the office for their warrant in all they do officially.

APPEAL from the Superior Court of Cook county; the Hon. JOSEPH E. GARY, Judge, presiding.

This was a bill in chancery, filed by Joseph Sherlock, John Ellis and twenty-four others, tax-payers in the village of Winnetka, Cook county, Illinois, against the village of Winnetka and others, to enjoin the collection of taxes levied to pay interest on certain bonds, the validity of which the bill questioned. The opinion of the court gives the necessary facts of the case.

Messrs. SCOVILLE, CORWIN & BAYLEY, for the appellants.

Mr. J. P. ATWOOD, for the appellees.

Mr. JUSTICE WALKER delivered the opinion of the Court:

This case was before us at a former term, on demurrer, (59 Ill. 389), when the decree was reversed, and the cause remanded, with directions that the court below overrule the demurrer and permit the defendants to answer. On redocketing the case, an answer was filed, a trial had and the bill dismissed, and damages assessed at $350, for the wrongful suing out of the injunction.

On the trial, the proof showed that the corporate authorities of the village purchased the ground described in the bill, at the price stated; that they issued $18,000 of its bonds, in sums of $1,000 each, which were sold between January and April, 1870; the bonds and coupons attached bore date the 1st day of June, 1869, but whether the first coupon falling due was clipped before sale or not, does not appear. These bonds bore ten per cent interest, and were to run ten years before maturing. Three of them were paid to

Wilson, of whom the property was purchased, at par, but the other fifteen were sold at nine-five cents on the dollar. That three of the bonds were sold to Wright, one of the members of the council, at the same rate of discount. That the money arising from the sale of these bonds was applied, $2,500 to the purchase of the ground, and the balance to erecting a building thereon for educational purposes, and in furnishing it, and in fencing the ground.

It further appears, that in 1870, the village authorities leased the property to the Winnetka academy, but reserved no rent, and they employed a teacher for a time and maintained a school, charging from ten to twenty dollars per quarter for each scholar ; but, being unable to sustain the school, they surrendered their lease about one year from its date. Thereupon the village council leased the property to the University of Chicago, a corporation situated beyond the limits of this district, for the period of five years, but reserved no rent. The university was, however, bound to keep a school of a grade sufficiently high to enable students educated by them to enter any college in the country. It was to be open equally to both sexes, and the charges for tuition to be reasonable. They further bound themselves to board students, not residing in the village, at $3.50 per week. The university took possession under the lease, opened a school, and are charging from ten to thirteen dollars per quarter for tuition of each student, and no exception is made in favor of students residing in the village.

About the first day of July, 1870, the village council issued and sold at the same discount, eight more bonds of $1,000 each, bearing the same rate of interest. With the proceeds a boarding house and dormitory were erected on the ground first purchased, at a cost of between $6,000 and $7,000, and one of these bonds was taken up and cancelled, leaving now outstanding $25,000 of these bonds. The boarding house and dormitory were included in the lease to the university.

The village authorities have maintained a common school in the village, employing a female teacher, but have never established a graded school for the use of the inhabitants of the district. The evidence shows that the amount of the tax charged was levied for the payment of the interest ; that the reduction was made in the assessment as charged.

The facts disclosed by the answer and proofs ‍raise some questions which were not discussed in the opinion announced when the case was previously before us.

There is no proof that the abatement from the amount of the assessment of the property of the railroad and Goss, was not on property exempt from taxation. If it had appeared that the deduction was on property liable to taxation, then the action of the village council would have been unauthorized and an abuse of power. The constitution provides that taxes shall be levied on a valuation on property, so that it shall be in proportion to the value of property owned by each person, the value to be ascertained by some person or persons, to be elected or appointed in such manner as the General Assembly shall direct, and not otherwise. Now, under the charter in this case, the assessor is required to be elected by the voters of the village. And when he was elected, he, and he alone, had the sole power to ascertain and fix the value of the property therein for taxation. He has conferred upon him the same powers as have township and county assessors. But no power of review or re-assessment is conferred upon the village council. They are neither elected nor appointed to value the property, nor to alter, change or correct the assessment made by the village assessor. He is the constitutional officer to make the valuation, and under this charter it can be made alone by him, and not otherwise.

The 9th section of article nine of the constitution,.in authorizing taxes to be laid and collected by municipal corporations, provides that such taxes shall be uniform in respect to persons and property within the jurisdiction imposing the

same.    To secure that uniformity, two things are essential: First, the assessments shall be just and equal, in proportion to the value of the property liable to assessment; and, secondly, when thus assessed, the rate shall be uniform as to every person, and on every species of property returned by the assessor for taxation.    And the constitution intends that the uniform value shall be ascertained by one officer,—the uniform rate imposed by a different set of officers, or a different person.    If the abatement of the assessment was from property liable to taxation, then there was a palpable violation of duty by the village council, as no such power is conferred upon them by the General Assembly, nor could they supply the want of power by ordinance.    That could only be done by the General Assembly, the source of power, when not restricted by the constitution.

If this property was liable to taxation, then the council destroyed the equality and uniformity of the assessment made by the assessor, and this too without the semblance of authority or legal power.    And such a reduction would, no doubt, authorize the tax-payers to enforce their rights by legal remedies against the village council, to the extent each tax-payer was injured by the change.    But, if it was clearly an abatement on property not liable to taxation, then they had the power to direct that the tax should not be extended against such exempt property.    But a deduction, although flagrantly wrong and unauthorized, would not be ground for holding the entire assessment invalid.    The objection that the bonds are illegally made payable at a bank in Chicago, does not invalidate them, as was held in the case of *Johnson* v. *Stark County*, 24 Ill. 75.    The agreement to pay at that place is void, but the balance of the coupons and bond are not rendered invalid for that reason.    In paying the interest the treasurer should not obey that agreement in the bond, but pay it at the village treasury.    If he were to deposit the money in the bank for the purpose, and it were to break, or the money should otherwise be lost, he

and his sureties would, no doubt, be liable for the loss growing out of his illegal act in placing the money in a place unauthorized by law. Or, if required to thus pay by the village council, and he were to conform to the requirement, the members of the city council would, no doubt, render themselves personally liable. Nor could the collector receive or retain any compensation for expense or trouble in paying the interest at the bank; and to retain it, or for the village council to allow it, would be a misapplication of funds, both by him and them, and should not be sanctioned.

The view taken of the case when it was previously before us, was, that the purchase of the property, the erection of the building, the issuing of the bonds, and the levy of the tax, were fraudulently contrived for the benefit of the members of the village council. It was, among other things, so averred, but the proof fails to sustain that theory. But striking out that averment, enough remains to present other and grave questions for our consideration. The charter authorizes the village council, as a board of education, to purchase grounds, erect buildings and borrow money to establish a school of a high grade. And the authorities have accomplished the purpose, so far as the purchase of the property, the erection of the building and the borrowing of the money are concerned. But have they established the school contemplated and authorized by the act? This depends upon the construction of the act conferring the power.

Was it intended that they should exercise this power and incur this debt, and thus burthen the people, that they might erect costly structures, simply to donate them by deed or lease, without rent, to a private corporation, or an individual, for their or his private emolument? We apprehend that no one could seriously contend that so unjust a purpose was intended by the law-making power. The language employed in the act does not, in terms or by implication, confer any such power, and we think it would be an abuse of language to say that it did authorize such action. And yet this is sub-

stantially what was done. We can only gather an intention, from the language employed, to establish a school of the character designated, for the use, and free use only, of all children of suitable age and advancement who resided in the district.

We have been referred to no instance, nor are we aware of any, where the legislature has authorized such burthens and exactions to be imposed upon the people for the benefit of private corporations or individuals, even in the interest of education, which has been so liberally cherished by our General Assembly. And even if it were conceded that the legislature can exercise so harsh a power, we could not infer that they so intended, unless the language was so clear and explicit as to leave no doubt that such was the design. But even if there could be a doubt as to the true construction of the first section, which we think there is not, all cavil is removed by the next section.

It provides that the territory of the village shall constitute a school district; and the council shall be, *ex officio*, a board of education, and in addition to the powers which school directors now have by law, shall have power to establish graded schools and a high school, build school houses for the same, and to levy taxes for the erection and support of the same. Can any one be found who will assert that directors of common schools have the power to burthen the people with debt, or to levy taxes, by the machinery of the law, to purchase ground and erect large and costly buildings, and then donate them to private corporations, or individuals, for their private use or gain, which is what was attempted by this lease? We think not. If such bodies can so act they possess a lurking power, that has not been suspected, which would enable them, under the forms of the law, to plunder the people to their ruin. No such power does or can exist under present enactments, even if it could be held constitutional to confer such dangerous powers.

· This board of education has only the power, and must conform to it, as is conferred on the directors of common schools, except so far as this charter enlarges and extends that power. The enlarged power enables this board to purchase property and erect buildings at a cost greatly larger than can school directors, without being authorized by a vote of the people of the district. And they are empowered, in addition, to borrow money and to issue bonds pledging the faith and property of the district for its payment, and likewise to establish graded schools and a high school. But we look in vain to this enlarged power for the slightest pretext for the authority to give away the property, or its use, to others. We are therefore clearly of the opinion, that this lease was without authority, and is a perversion of the property from the uses to which the charter intended it to be applied.

But the perversion of the property, or the waste of the funds, by the board of education, does not render void the bonds that were legally issued. Had a bill been filed to prevent the bonds from being issued, because of an intended perversion, on a showing that the property would be thus perverted, they would have been enjoined from putting them into circulation; and it may be that the members of the board of education are liable to account for any loss that has been incurred by the perversion, but that would not render the bonds void in the hands of innocent holders. The board had the power to issue them, and when issued, and held by third persons, in good faith, they must be enforced. What we have said applies to the fifteen bonds held by other persons than Wright, and those issued to build the boarding house and dormitory.

It is urged that the board of education had no power to discount these bonds when they were sold; that the rate of interest is limited by their charter to ten per cent, whilst, when sold for $50 less than the face of each bond, and with, perhaps, seven to ten months accrued interest, as they

were dated that length of time before they were sold, the rate of interest actually paid was much more than ten per cent per annum. Whilst we regard this action of the board of education as unauthorized and an abuse of power, and for which they are, probably, individually liable to the extent of the loss thus incurred, that act would not render the bonds void. Whilst it may, no doubt, be relied upon in the hands of the original holder as usury, it by no means follows that it renders the bonds invalid.

As to the three bonds purchased by Wright, at a discount, whilst a member of the board, and we presume are still held by him, the opinion heretofore filed, when the case was formerly before us, holds that he had no power to purchase. He had, as there said, no power to so purchase them. He had no right to trade or speculate in the property or credits of the corporate body of which he was one of the managers. If he could deliver the bonds to himself at 95 cents on the dollar, he would have the same power to do so at 75 or 50 cents, or even less, on the dollar. He could not, as there said, purchase from himself, or of the body of which he was a member. An amount of taxes, equal to the interest on these bonds, was illegally levied and should have been enjoined.

We now come to consider the question, whether the $7,000 of bonds outstanding, which were issued to raise the money to build the boarding house and dormitory, was authorized under the charter. It can not be contended with justice, or even plausibility, that school directors have any such power. Language can not be so tortured as to hold that they possess any such power. Nor can the additional powers conferred on the board of education be construed to authorize it. Such a thing is, no doubt, unheard of as to common schools, created for the benefit of all, and sustained at the public expense. Such attachments are usual with colleges and universities, no doubt, but we have seen that this was intended to be a public school, free to all of the people of the district of suitable age and advancement to enter it.

And hence we can not presume that because private colleges and State institutions may have such buildings, the legislature intended this free, although a high school, should have the same, and the people burthened with the expense of their erection. Nor can it be said that such an erection is at all necessary or proper for the use of a free high school, any more than are any other hotel accommodations in the village. And this was but the construction of a boarding house for the accommodation of students from abroad for boarding and lodging. It would have been just as legal to have levied a tax upon the people for $700 annually, the amount of the interest on these bonds, and paid it to the hotel keepers of the place, to reduce the cost of board to students, as to build this house and give its use to the university free of charge. Yet such a measure would be regarded as an outrageous perversion of the powers conferred by the charter.

Such officers can only exercise the powers conferred expressly or by implication. They may, no doubt, do such things as may be necessary and essential to effectuate the purposes of the creation of the body of which they were officers. But they have not an unlimited discretion. They must look to the law creating the office for their warrant in all they do officially.

That such a building as this boarding house and dormitory is wholly unnecessary and even improper for a free school, for the people of the village, is perfectly apparent. And not only so, but the board of education were not authorized to construct it by taxation or by issuing bonds to raise money for the purpose, and in doing so they acted without authority. It was not merely an abuse of the power, but it was an act performed without power. And the bonds being so issued, there was no legal power to levy the tax to meet the accruing interest on them, and the tax to that extent should have been enjoined. There was, therefore, error in dismissing the bill, and the decree of the court below must be reversed, and the cause remanded for further proceedings not inconsistent with this opinion. *Decree reversed.*