# MacDOUGALL v. BOARD OF LAND COM'RS. OF STATE OF WYOMING, ET AL.

(No. 1911; October 1, 1935; 49 Pac. (2d) 663)

494

For the appellant there were briefs and the cause was argued orally by *Harry B. Henderson, Jr.,* of Cheyenne.

For the respondents there were briefs by *Chiles P. Plummer* and *Clyde M. Watts,* and by *Ray E. Lee,* Attorney General; *Thos. F. Shea,* Deputy Attorney General, and *Wm. C. Snow,* Assistant Attorney General, all of Cheyenne, and oral arguments by *Messrs. Plummer, Watts* and *Lee.*

BLUME, Justice.

On December 8, 1933, the Board of Land Commissioners of this state, as party of the first part, entered into a contract with Shepard-Pendleton & Company, as party of the second part, sometimes herein referred to as the auditing company, for the investigation, etc., of certain debts thought to be due to the state under oil, gas and other mineral leases, the contract reciting that it is the desire of the state to employ the auditing company to ascertain whether true and accurate accountings have been made to it, and "whether the methods used in ascertaining the quantity and quality of the oil, or gas produced" have been accurate. Among other things, the contract provides:

"FIRST. The Parties of the Second Part hereby agree to proceed diligently to check operations now existing and heretofore used in determining the quantity and quality of oil, gas and/or gasoline produced from the said real properties and to audit such producing records as may be deemed advisable by the Parties of the Second Part, in order to determine as

soon as possible whether or not the persons or companies that have produced or purchased oil, gas and/or gasoline from said above described real property have accounted for lessor's royalties for all of said production, and as to whether or not said lessees have damaged the Party of the First Part in carrying on their operations under the leases hereinbefore referred to, and to render to the Party of the First Part a detailed report as to such findings, and render their opinion as to whether a cause of action on the part of the Party of the First Part exists against such lessee or lessees, for damages by reasons of failure or neglect on the part of any lessee or lessees to properly carry out and perform the terms of its or their lease or leases covering such oil and gas properties.

SECOND. The Party of the First Part hereby agrees to pay a contingent fee to the Parties of the Second Part for their said services as follows:

25% of the first $1,000,000.00 which may be recovered on account of any such claims, damages, demands or causes of action.

16.66% of any and all recoveries had of any sums in excess of $1,000,000.00.

The term recoveries includes all sums or things of value which may be received, had or recovered either as a result of settlement of claims, damages, demands or causes of action against any lessee or lessees or as a result of litigation against any lessee or lessees.

THIRD. The Party of the First Part shall and it hereby does give to the Parties of the Second Part such power of attorney or authority as they shall require in rendering their service as aforesaid, and in particular, said Party of the First Part shall and it hereby does give to the Parties of the Second Part full and complete authority and makes them its agents and does hereby constitute them its attorney-in-fact with authority to demand, inspect, take copies of and investigate all books, records and methods now or heretofore or hereafter used by said lessee, and to take samples.

FOURTH. The Parties of the Second Part hereby agree to pay all costs and expenses incident to their

services as aforesaid and the Party of the First Part shall not be liable for any services rendered or expenses incurred by the employees or agents of the Parties of the Second Part.

FIFTH. The Parties of the Second Part further agree that, upon the completion of their preliminary investigation under the terms of this contract, they will prepare a detailed report setting forth the facts evidenced as the result of such investigation and will cause two copies thereof to be delivered forthwith to the Party of the First Part and one copy thereof to be delivered at the same time to Messrs. Hanna and Morton, as attorneys for the Party of the First Part.

The Parties hereto further agree - - -

1. That the determination made by Messrs. Hanna and Morton after consideration of said report as to the advisability of continuance of said investigation by the Parties of the Second Part under the terms of this contract, will be binding upon the parties hereto."

George D. McDougall, the plaintiff in the lower court, and appellant here, a citizen and taxpayer of Laramie County, Wyoming, brought this action on behalf of himself and all others similarly situated, to have the contract above mentioned declared void. It is not necessary to set out the allegations in detail. A copy of the contract is attached to the petition and is made a part thereof. It is alleged that it is illegal; that it involves the lands and funds of the permanent school fund; that the contract is an unlawful appropriation of funds by defendant board, and is an act beyond its powers; that other officials of the state are directed by law to perform the duties unlawfully delegated to the auditing company, and that in any event, the compensation to be paid to the auditing company is unreasonable and unconscionable. The petitioner asked that the contract be cancelled and the board enjoined from carrying it out. Demurrers to the petition were filed on behalf of the defendants, setting forth that the petition does not state facts sufficient

to constitute a cause of action. These demurrers were sustained, and the petitioner standing upon his petition, judgment was rendered against him, from which his appeal herein is taken. A number of points are urged why the action of the trial court should be reversed. Some of them are difficult of solution, and we shall base our decision herein only upon grounds which we deem to be clear. Some reference is made in the briefs to c. 77, Session Laws of 1935, but since that act was not passed until long after the contract herein was entered into, we shall not determine the effect or the validity thereof. See State Board v. Coleman, 235 Ky. 24, 29 S. W. (2d) 619.

1. Section 40 of Article III of the Constitution of this state provides that money collected from any delinquent must be paid into the treasury of the state. The section reads:

"No obligation or liability of any person, association or corporation, held or owned by the state, or any municipal corporation therein, shall ever be exchanged, transferred, remitted, released or postponed, or in any way diminished by the legislature; nor shall such liability or obligation be extinguished, except by the payment thereof into the proper treasury."

And under Section 35 of the same article, the money cannot be withdrawn from the treasury except pursuant to an appropriation made by the legislature and a warrant duly issued. The section reads as follows:

"Except for interest on public debt, money shall be paid out of the treasury only on appropriations made by the legislature, and in no case otherwise than upon warrant drawn by the proper officer in pursuance of law."

That such a provision is mandatory has often been decided. 59 C. J. 235. This court said in State v. Burdick, 4 Wyo. 272, 33 Pac. 125:

"As has been indicated herein, the constitutional requirement that no money shall be paid from the

treasury except by appropriations made by the legislature or by law, means that no money shall be paid out of the treasury except in pursuance of some law. It inhibited the expenditure of the public money at the mere caprice of those in power at their own pleasure, without authority derived from the sovereign people, as expressed by them, either in their written constitution, or by the consent of their representatives freely chosen, in their solemn enactment."

It is almost too clear for argument that under these provisions the money collected under the contract in question is required to be paid into the treasury of the state; that it becomes a part of its funds, and that it cannot be paid out except pursuant to an appropriation made by the legislature and a warrant duly issued. We find no constitutional provision and no law which gave the land board authority to agree to pay out the money collected under the contract herein involved. The allegation, therefore, that the contract makes an unlawful appropriation of the funds of the state must be held to be true. Lewis v. Colgan, 115 Cal. 529, 47 Pac. 357; Polk v. State, 138 Cal. 384, 71 Pac. 435; see also Lingo-Leeper Lumber Co. v. Carter, (Okl.) 17 P. (2d) 365; 25 R. C. L. 392, 395, 396. And inasmuch as the compensation therein mentioned was the inducing cause for entering into it, and we have no authority to strike out the provision relating thereto, the whole contract must necessarily fall. State ex rel. v. Sawmill Co., et al., 119 Miss. 432, 81 So. 124.

2. The attorneys for plaintiff contend that the contract authorizes Shepard-Pendleton & Company to conduct and control litigation on behalf of the state, a duty imposed by law on the attorney general, and that it is invalid on that account. The defendants contend that no such power is given the auditing company. The point is somewhat in doubt, and we need not decide it. But an objectionable control is given by the contract in at least a more limited field. The auditing

company is authorized not only to investigate whether true and accurate accounting has been had, but also whether it is being had, without limitation of time. Hanna & Morton are appointed as the attorneys for the state. It does not appear who they are. We take judicial notice, however, of the fact that they are not officials of the state, authorized by law to represent it. They are given the absolute power to determine whether the investigation authorized by the contract shall continue, and when or whether it shall end. The state, through its proper officials, has been left no discretion in the matter, and seemingly, the investigation above mentioned could continue indefinitely. There are serious objections to such a contract. The general rule is that contracts extending beyond the term of the existing board, thus tying the hands of the succeeding board and depriving the latter of its proper powers, are ordinarily, though not always, void as contrary to public policy. Hyde v. Board, 47 Wyo. 101, 31 P. (2d) 75. The contract in question would seem to fall within the condemnation of that rule. Moreover, the general rule is that no discretionary power may be delegated by officials. 46 C. J. 1033. Speaking of the control of litigation delegated by a land commissioner to an attorney, the Mississippi court in State ex rel. v. Sawmill Co., et al., supra, said:

"The land commissioner is a trustee of the public, and cannot surrender his official control, or cannot contract away his right to control the litigation which the statute authorizes him to institute. In the contract or agreement set out in the statement of facts no particular lands are mentioned, and no particular defendants are named. We think in cases of this kind that the facts and particulars constituting the cause of action should be brought to the attention of the land commissioner before a suit is instituted, so that he may bring to bear upon the question and particular facts his official discretion as to whether such particular suit shall be brought. He is certainly not bound by a blan-

ket contract, under which any citizen of the state might be compelled to run the gauntlet of litigation with the state without having the officer designated by law to pass upon the particular case as to whether a suit should be brought or not. Whatever may be the rule governing the relation between the attorney and client when the parties are acting in their personal capacity, it is clear that officers must be controlled by the law in making their contracts, and that officers cannot delegate their discretion unless expressly authorized to do so by statute."

The control of an investigation such as is contemplated in the contract in question, involving as it does the authority to demand and inspect books and records, and thus harass citizens or residents of this state, is of the same nature as the control of litigation and must be judged by the same rule. While the investigation itself, doubtless, is a ministerial act, the fact whether it shall be made or how long it shall continue involves discretion, which, as already stated, cannot be delegated, and the provision, accordingly, delegating at least part of that right to Hanna & Morton, is clearly void. Whether or not the whole contract is thereby invalidated is a more difficult question and need not be decided herein.

3. In order that a more comprehensive view of the question in hand may be had, it may be well to discuss other reasonably well settled principles. There was no express constitutional or statutory authority for the state land board to enter into the contract in question. If such authority existed it must be an implied one. The law is well settled that public officers have and can exercise only such powers as are conferred on them by law. 59 C. J. 172. They, or a board, cannot bind the state by a contract employing an agent, assistant, or servant, unless the making of such contract was clearly within the authority conferred by law. 59 C. J. 173. On the other hand, it has been held that they

have implied authority to employ such assistants as are necessary for the efficient discharge of their duties. 59 C. J. 173. Throop on Public Officers, Sec. 542. And there can be no doubt that, in a limited sense, this is a reasonable rule. Where legislative authority exists for a contract, such as an erection of a building, power to do things absolutely necessary to accomplish the purpose, as, for instance, the employment of an architect at a fixed compensation, should probably be held implied (see State v. Buchanan, (Tenn.) 62 S. W. 287; Palmer v. State, 106 Misc. 696, 175 N. Y. S. 294), although some doubt is cast even in such case by the text in 59 C. J. 174 on the power to fix compensation. In any event, the rule must be construed in the light of, and as limited by, the rule previously stated. Thus the power of the governor to supervise the conduct of other executive officers, or to require information relating to the duties of the latter, has been held not to imply the right to employ experts to examine the books of a state institution. Young v. State, 19 Wash. 634, 54 Pac. 36. See also State ex rel. v. Sawmill Co., et al., supra. In fact, the rule of implied power has been characterized as a "somewhat dangerous doctrine." Polk v. State, 138 Cal. 384, 71 Pac. 435, 648. In exercising it, the officials do not have an unlimited discretion. Sherlock v. Winetka, 68 Ill. 530. And the Nebraska Supreme Court seems to be of opinion that unless the necessity for a contract involving expenditures, not authorized by the legislature, appears, the contract will be held invalid. State v. Cochran, 113 Nebr. 846, 205 N. W. 568. Such necessity does not appear here. As clearly illustrative in the case at bar are two California cases, in which it is held that even though a board may employ an expert when necessary, it cannot bind the state in the absence of legislation, for any remuneration. Lewis v. Colgan, 115 Cal. 529, 47 Pac. 357; Polk v. State, supra. In the first of these

cases, in which there was no express legislative provision, the court said:

"It does not follow from this view that their authority in the matter (in hiring an expert) is unlimited and unrestrained, as appellant assumes it would be. On the contrary, whatever they do is subject to the approval of the legislature. They may employ an expert, but he cannot be paid without an appropriation, and he can be paid no more than the legislature may deem reasonable. He is not an officer with a fixed term of office and a salary ascertained by law, but a mere employe of the board, holding his position at their pleasure, and entitled to such compensation only for the time of his employment as the board may allow and the legislature approve by the appropriation of money for the payment."

This case was followed in Polk v. State, supra, involving the employment of an expert hired by the railroad commissioners. Under these decisions, it is clear that the state land board in the case at bar had no authority whatever to agree to the compensation mentioned in the contract.

The rule of implied power is, moreover, subject to another rule, which seems to be generally recognized, namely, that where the performance of a duty is vested in a certain official or officials, a contract imposing that duty upon someone else is invalid. Annotation 32 A. L. R. 88; 11 A. L. R. 914; Burchard v. State, 58 N. D. 841, 227 N. W. 564; Gibson v. Kay, 68 Or. 589, 137 Pac. 864. In other words, the executive department cannot usurp the functions of the legislature—a doctrine too well established in American jurisprudence to be questioned. The duty contemplated in the contract in the case at bar seems to be two-fold. It provides that the auditing company should investigate and report "as to whether or not said lessees have damaged the party of the first part in carrying on their operations under the leases hereinbefore referred to."

That seems to contemplate the physical operations of the oil and gas wells. If that is correct, then the contention that the law has made ample provision for the performance of the foregoing duty seems to be well taken. Section 78-301, Rev. St. 1931, provides that in order to prevent "negligent methods of operation, the state geologist shall prescribe and enforce rules and regulations governing the drilling, casing and abandonment of oil and gas wells and the waste of oil and gas therefrom." The next section provides that in order that these provisions may be carried out, two inspectors shall be appointed, each with at least three years' experience, and at a salary of $250 per month. Ample provision, accordingly, appears to be made for the ascertainment of damages to the state by reason of negligent physical operation of oil and gas wells in the state, and the right to employ outsiders for that purpose would seem to be excluded.

The remaining duty contemplated by the contract is to ascertain as to whether or not the state has been paid the amount of royalty due it under its leases, and in connection therewith to ascertain the methods used in accounting therefor. If that duty is imposed upon officers of this state, then, under the rule stated, the contract delegating it to some one else is void. Under Section 3 of Article XVIII of the State Constitution, the governor, secretary of state, state treasurer, state auditor and superintendent of public instruction constitute a board of land commissioners who shall "have direction, control, leasing and disposal" of all state lands, under the direction of the legislature. By section 91-801, Rev. St. 1931, the board is authorized to lease any state or school lands "supposed to contain coal, or minerals, and to make and establish rules and regulations governing the issuance of such leases and covering the conduct of development and mining operations to be carried on thereunder." Sections 91-515

and 91-516 provide that all rents received from lands sold or leased by the state shall be paid by the board to the treasurer of the state. This undoubtedly includes royalty from mineral lands received by it. The board has been provided with a secretary, called a commissioner of public lands. Sec. 91-201. He is required to give a bond to safely keep all moneys collected by him (91-202), and to deposit such money into the treasury monthly (92-101). He keeps the books and accounts and must "perform such other duties concerning the business transactions of said board as it may direct." And for the purpose of properly performing his duty, he is empowered to appoint a deputy. Sec. 91-211. These provisions make it, by necessary implication, the express duty of the land board and the officials provided by statute, to collect the moneys due to the state as rental or royalty. And this in fact has been done throughout statehood.

There is here no specific mention of a duty to ascertain the amounts actually due, or the methods used in the accounting. It would, however, seem clear, that this is implied. It is a general rule that the "duties of a public office include those lying fairly within its scope, those essential to the accomplishment of the main purpose for which the office was created, and those which, although incidental and collateral, serve to promote the accomplishment of the principal purposes." 46 C. J. 1035. The board would not be performing its duties by merely accepting what is offered by the debtors of the state. It has been well stated that "diligence, integrity and intelligent discretion, in the discharge of their duties, are required of the public officers, particularly where the rights of the public may be jeopardized by their neglect, and their obligation to the public is not discharged by a mere perfunctory performance thereof." 46 C. J. 1036. If some or all of the members of the board have not the time or

the qualification to make a check such as we have indicated, the law has provided them with the means to do so—through its secretary and his deputy, whom, under the law, they may require to perform that duty. The means of performance have thus been pointed out, and where that is true, there is no room for implied powers. State v. Clausen, 84 Wash. 279, 146 Pac. 630; 46 C. J. 1032. As further said in the case last cited: "The state has an interest in the selection of officers charged with the administration of its laws, and this interest is not to be deemed surrendered, unless upon the clearest implication." Moreover, the legislature has each year fixed the amount of money which may be expended by the officials of this state. Each year an appropriation has been made. Salaries of the elected and appointed officers have been appropriated separately, including those of the commissioner of public lands and his deputy. Aside from that, and aside from expenses incidental to matters not involved herein, it has allowed contingent expenses. Thus in 1927, it allowed to the commissioner of public lands a contingent expense of $58,000; and for the field department an additional contingent expense of $20,500. In 1929, an appropriation was made for contingent expense of $65,080. Similar appropriations were made for other years. It seems clear that if the legislature had deemed it advisable to allow any greater expense, it would have so provided. We think, accordingly, that the officials of this state must be held to have been required by the constitution and the laws of this state to ascertain, in connection with the collection of money under contracts, the amounts due thereunder, and that the legislature did not contemplate that this should be done by some one else at the expense of the state.

There is another fundamental reason, aside from those already mentioned, why contracts of the nature involved herein, entered into without legislative au-

thority, should not be favored. No rule of law can be sound which encourages officials to neglect their duty. If state officials, charged with the collection of money due to the state under contract, were permitted to act merely perfunctorily, fail to ascertain the amount due, and in a month or a year or other time, were allowed to hire experts at large expense to do what they themselves should have done, they might deprive the state of large amounts of money, which could, by their own proper efforts made at the time, have been easily saved. Not alone would this encourage neglect of duty on their part, which is against public policy, but it might easily open wide the door to fraud, which cannot be countenanced. Moreover, the case at bar involves the permanent school fund, the maintenance of which is guaranteed by the constitution (State ex rel. v. Snyder, 29 Wyo. 163, 212 Pac. 758), and we conceive that not even the legislature could authorize a contract similar to that here involved, under circumstances which might easily bring the vices above mentioned into operation, and thus fritter the fund away without excuse. The contract in the case at bar may be of great benefit to the state. But that alone cannot be the controlling fact herein. Other contracts, entered into in the future, might be the reverse. All the law can do is to operate by general rules, which, in the long run, will be best for the interests of the state, and no rule will subserve that purpose which discourages diligence and honesty in public officials. It may be argued that public officials are not required to do anything beyond making all reasonable efforts to perform their duty, and that after they have done so, occasions may still arise when an expert might be employed to the advantage of the state, and without in the least bringing about the evils mentioned. And that, doubtless, is true. And if occasion of that kind arises, and it is clear, they may, perhaps, as held in California, employ

such expert, provided that they do not attempt to fix the compensation. In such case, when their acts must be approved by the legislature, the evils above mentioned would at least be minimized, or entirely overcome.

For the reasons stated, the judgment of the trial court must be reversed, with direction to overrule the demurrers ,and for further proceedings not inconsistent with this opinion.

*Reversed With Direction.*

KIMBALL, Ch. J., and RINER, J., concur.