No. 20,615.

T̄he City of Colorado Springs *v.* Kitty Hawk
Development Co.

(392 P. [2d] 467)

Decided May 4, 1964.     Rehearing denied June 8, 1964.

Mr. F. T. HENRY, Mr. LOUIS JOHNSON, for plaintiff in error.

Messrs. COOL & PHILLIPS, Mr. H. T. McGARRY, for defendant in error.

Messrs. RYAN, SAYRE, MARTIN & BROTZMAN, Amici Curiae.

*En Banc.*

MR. JUSTICE PRINGLE delivered the opinion of the Court.

DEFENDANT in error, Kitty Hawk Development Company, hereinafter designated as plaintiff or Kitty Hawk, instituted this action against the plaintiff in error, City of Colorado Springs, hereinafter designated as defendant or City, to recover the sum of $25,378.08 paid by it to the City. It alleged that the payment was made pursuant to Section 2E (1) of the City's Subdivision Ordinance, No. 1987, as amended and that the said section was unconstitutional, specifying numerous grounds therefor. Trial was to the court and at the conclusion thereof the court rendered judgment for plaintiff in the amount claimed, together with interest, and declared said Section 2E (1)

unconstitutional on the grounds, among other things, that it (1) provides for the taking of property without due process of law in violation of Article II, Section 25 of the Constitution of the State of Colorado; (2) violates Article II, Section 3 of the Constitution of the State of Colorado; (3) usurps a judicial function in that it prohibits the determination of the value of land by judicial process, leaving such valuation to a commission without benefit of appeal; and (4) places an unequal burden of tax upon the plaintiff. From this judgment, the City brings error.

Section 2E (1) of the City's Subdivision Ordinance reads as follows:

"*Allocation of Land for Public Spaces.* The owner of the land in each subdivision shall allocate and convey eight per cent of the area of the land in his subdivision, exclusive of streets and alleys, for park, playgrounds, schools, recreational or similar public purposes, at such location as designated by the City or at the option of the City, said owner, shall in lieu of such conveyance of land in kind, pay to the City in cash an amount equal to eight per cent of the value of the land. If the City and the owner fail to agree on the value of said land, such value shall be fixed and established by the Real Estate Appraisal Committee of the Colorado Springs Board of Realtors. The proceeds of said payments shall be deposited in a separate City account and shall be used only for the acquisition of land for parks, playgrounds, schools, recreational or similar public purposes. The provisions of this ordinance shall be applicable to each area, territory, subdivision or addition which is being, or is hereafter annexed to the City of Colorado Springs to the end that there shall be allocated or paid to the City of Colorado Springs the eight per cent in land or value thereof in dollars as herein provided. To the extent that public uses or areas have been provided in said area or territory annexed to the City, such uses or areas may receive credit at the option of the City to the ex-

tent applicable upon the eight per cent allocation of land or equivalent value in dollars thereof." .

Of utmost importance in resolving the issues raised by this writ of error is a thorough understanding of the circumstances under which the payment of $25,378.08 was made by Kitty Hawk to the City.

In 1954, Kitty Hawk was incorporated for the sole and exclusive purpose of acquiring and subdividing a large tract of land contiguous to the City and owned by one Ruby von Rosenberg Menzer. Robert Morrison, president and a major stockholder of the plaintiff, "did practically everything" in regard to the mechanics of development. Morrison had served in an executive capacity in several other large real estate developments in Colorado and was a seasoned businessman with many years of practical experience in the field of real estate and land subdivision.

On August 10, 1954, the plaintiff entered into a contract with Menzer for the purchase of her land, the total purchase price being $442,215.00. The contract called for the payment of $10,000.00 upon execution and further payments in installments to be made in part "* * * *upon arrangements being completed with the City of Colorado Springs to furnish utilities for said land, * * *.*" (Emphasis supplied.)

On August 23, 1954, the contract was amended in pertinent part as follows:

"It is understood that purchaser shall use due diligence to have said property legally and properly zoned, the plat to said land approved and *arrangements completed for the installation of utilities with the City of Colorado Springs, Colorado, but in the event that said purchaser is unable to obtain said platting, zoning and arrangements for utilities, then this contract shall become null and void and the payment made hereunder as provided in Paragraph 1, Sub-paragraph A, Page 2 shall be returned to purchaser.*" (Emphasis supplied.)

On February 18, 1955, the contract was supplemented, said supplement containing the following recitals:

"WHEREAS in and by said contract it was contemplated that said lands be platted as a subdivision in El Paso County and that utilities be acquired by agreement with the City of Colorado Springs, and

"WHEREAS the said City of Colorado Springs has refused to furnish said utilities unless and until said property is annexed to said City of Colorado Springs, and

. "WHEREAS the proper officers of the said City of Colorado Springs have authorized the annexation of said land to said City of Colorado Springs and such annexation is now in the process of being accomplished, and

   *  *  *  *  *  *

"WHEREAS by reason thereof it is proper and necessary that said agreement be changed, altered and amended in the particulars hereinafter set forth and the parties hereto hereby mutually agree to such changes, alterations and amendments, to-wit:

"1. That sub-paragraph B of paragraph 1 of said original contract as heretofore amended, be amended to read as follows:

" 'B. On or before ten (10) days after said property shall be duly and properly annexed to the City of Colorado Springs and shall be zoned substantially in the manner and for the usages and purposes specifically described and set forth on the plat of said land as attached to the original contract and made a part thereof with the exception, however, that the portion of said land set off for usage as a shopping center shall at this time be rezoned for usages as residential property and *an agreement has been made with the City of Colorado Springs for the furnishing of utilities to said land,* then the Purchaser shall * * *.' " (Emphasis supplied.)

In September, 1954, a plat of the Kitty Hawk Subdivision had been approved by the Planning Commission and the Board of County Commissioners of El Paso

County. On March 8, 1955, the Subdivision was annexed to the City by Ordinance 2204, which provided in pertinent part:

"* * * provided, however, that said territory is subject to all ordinances of the City of Colorado Springs, relating to the extension of Utilities, the Subdivision of said territory and any and all other ordinances in any way effecting (sic) said land and territory."

Subsequent to annexation, a plat of the Subdivision was approved by the City and thereafter, on August 12, 1955, the plaintiff paid $25,378.08 to the City.

Before the trial, the parties stipulated that subsequent to the annexation, water and sewer lines and other utilities were installed in the Kitty Hawk Subdivision; that streets have been built and other municipal services, including fire and police services, have been furnished. Houses have been built and sold by various contractors on a substantial portion of the lots within the Subdivision.

At the trial, the only witness called by the plaintiff on its case-in-chief was Robert Morrison. He testified that among the factors he considered in deciding whether a particular subdivision would amount to a profitable investment were the costs of curbs and gutters, sidewalks, water, sewer, gas and electrical services. He testified further that investigations were made as to these costs in relation to the Kitty Hawk Subdivision both before and after signing the contract for the purchase of the land from Menzer.

The record discloses that Morrison and his associates did not originally intend to seek annexation of Kitty Hawk Subdivision to the City, but preferred instead to remain in the County of El Paso. After the County had approved of the plat of the Subdivision, plaintiff's representatives were informed by an employee of the City that water and sewer services would not be forthcoming from the City unless and until the Subdivision was annexed, and they were further informed that if the

plaintiff chose to annex, it would be required to make payment to the City in a sum equivalent to eight per cent of the appraised value of the Subdivision, this being the percentage expressly stated in Section 2E (1) of the City's Subdivision Ordinance set out above.

Prior to annexation, Morrison was advised by his attorney that, in his opinion, the City's position on water was not legally correct and that the same could be obtained without annexation, but that this would entail lengthy and costly litigation. Thereafter, Morrison held several meetings with plaintiff's Board of Directors, at which the cost of annexation in order to obtain the needed water and sewer services was discussed. At this point it was estimated that the payment required would be in the neighborhood of $20,000.00 or $25,000.00 and the Board of Directors "gave very serious consideration to just dropping the thing and walking away and leaving it." Instead, the Board of Directors decided to proceed with the Kitty Hawk Subdivision, with full knowledge of the payment which the plaintiff would be required to make in order to secure annexation to the City and acquire the needed water and sewer services. A material factor in this decision was the development of the Air Force Academy near the City, which Morrison and his associates contemplated would substantially add to their profits.

This suit to recover the payment of $25,378.08 was instituted on April 14, 1961, almost six years after the payment was made. The record discloses the following:

"Q. Mr. Morrison, can you tell us why you waited until 1961 to file suit on this thing?

 . .        *   *   *

"A. Yes. About two years ago I was in Mr. Cool's office and we were discussing other legal matters and he asked me at that time, 'Did you pay a subdivision fee to the City?' I said yes. 'What was it,' he said, and I said 'It was about twenty-five thousand dollars. It was

eight per cent of their appraisement.' And he said, 'Did you know that there was some litigation as to whether that fee was legal or not?' and I said 'No.' And he says 'There seems to be a little question about that.' And at that time I asked them, 'Why don't you look into it and find out? If it is illegal, I didn't want to pay· it.' I just took it for granted — unless I wanted to go ·into litigation on that water deal. But that would have taken a long time. Q. So I take it you were satisfied with your arrangement and deal with the City until it was mentioned by Mr. Cool? A. I wasn't satisfied but I had to do it. Q. You had made an agreement and you were satisfied with it, is that right? A. I wasn't satisfied, but I had made an agreement and I had to sell the ground — and I had to have the utilities."

◼ In our view, it is not necessary under the circumstances of this case to determine the constitutionality of Section 2E (1) of the City's Subdivision Ordinance, since the plaintiff is precluded by other matters appearing in the record from recovering that which it sought. We have consistently held that when a controversy can be decided upon other grounds, we will make no inquiry concerning the constitutionality of a statute. See *State ex rel. Cruse v. American Can Co.,* 117 Colo. 312, 186 P. (2d) 779.

The testimony of Robert Morrison himself and the documentary evidence establishes beyond question that:

(1) The plaintiff was in need of water and sewer services from the City, but preferred not to annex to the City;

(2) Plaintiff could obtain City water and sewer services only in the event of annexation of the Kitty Hawk Subdivision to the City;

(3) The City conditioned annexation upon payment by the plaintiff to the City of an amount equal to eight per cent of the appraised valuation of the Subdivision;

(4) The plaintiff agreed to annex to the City and to

make the payment required by the City so that it might receive water and sewer services;

(5) Water and sewer services were supplied plaintiff upon annexation and the payment of $25,378.08.

█ It is now well established in this state that a city is under no obligation to sell or furnish water or sewer services to anyone outside its corporate limits, but, if it elects to do so, it acts in a proprietary capacity, and the relationship entered into between a city as a supplier and such users is purely contractual. *City of Englewood v. City and County of Denver*, 123 Colo. 290, 229 P. (2d) 667; *City of Colorado Springs v. P.U.C.*, 126 Colo. 265, 248 P. (2d) 311; *Lee v. City of Colorado Springs*, 136 Colo. 248, 315 P. (2d) 822 (cert. denied) 355 U.S. 955, 2 L.Ed. (2d) 531, 78 S. Ct. 541. Pertinent here is a quotation from the *City of Fort Collins v. Park View Pipe Line*, 139 Colo. 119, 336 P. (2d) 716 where this Court approved the following language from *City of Phoenix v. Kasun*, 54 Ariz. 470, 97 P. (2d) 210:

"After a careful consideration of all the authorities we are of the opinion that the controlling factors in the present case are that the City was under no obligation, as a matter of law, to furnish any service to the plaintiff; that the relationship between them was purely contractual in its nature, and that such being the case, the reasonableness or unreasonableness of the rates fixed by the contract are not subject to review by the court. The only right which it has under the circumstances is to determine whether the City is complying with the terms of its contract, * * *."

█ No governmental power was bargained for here, nor was any constitutional right surrendered, for plaintiff had no constitutional or statutory right to receive water and sewer services from the defendant. Nor is it material that the consideration which the City required in return for furnishing such water and sewer services was annexation and the payment of an amount equal to that required by Section 2E (1) after the plaintiff was

annexed. Though Section 2E (1) was used by the parties as the method of computing the amount demanded by the City for water and sewer services and for determining the time of payment, such fact does not affect the validity of the contract. Both parties knew approximately what the figure would be before plaintiff agreed to annex. Morrison discussed it with plaintiff's Board of Directors and after much discussion they agreed to proceed on the terms outlined by the City because, as Morrison testified, "it was smart," [it was] "a good business venture."

Much is made in the plaintiff's brief of "business compulsion." In the instant case the implications of that doctrine are not applicable. The only "compulsion" — legal or otherwise — serving to motivate Morrison and his associates was the desire to make a profit on the Kitty Hawk Subdivision. In order to do this, water and sewer services were essential. The City was under no obligation to furnish these services for property without the City's corporate limits. The plaintiff wanted water and sewer services; the City required annexation and a sum of money equal to eight per cent of the appraised value of the property. Each got what it bargained for. Morrison's own testimony is that up to the time this decision was made Kitty Hawk was under no legal obligation to purchase the property or to proceed with its subdivision plans. In such circumstances, the equities clearly do not lie with the plaintiff. We see no reason, legal or moral, why the plaintiff should have all of the benefits of its bargain by which it obtained the water and sewer services it needed in order to carry out its plans, and yet receive back from the City a portion of the consideration which it gave in order to obtain these services, which the City was under no constitutional or statutory obligation to furnish.

■ We find nothing in the general law of this state or in the Constitution prohibiting the imposition of conditions by a municipality upon one seeking annexa-

tion. A municipality is under no legal obligation in the first instance to annex contiguous territory, and may reject a petition for annexation for no reason at all. It follows then that if the municipality elects to accept such territory solely as a matter of its discretion, it may impose such conditions by way of agreement as it sees fit. If the party seeking annexation does not wish to annex under the conditions imposed, he is free to withdraw his petition to annex and remain without the city. Annexation can take place only when the minds of the city and the owners of the land contiguous to the city agree that the property shall be annexed and upon the terms upon which such annexation can be accomplished.

In *Schlarb v. North Suburban Sanitation District,* 144 Colo. 590, 357 P. (2d) 647, the plaintiff brought an action to recover a sum of money paid to the defendant district as a condition of having his property annexed to the district. Judgment was rendered for the defendant and in affirming the judgment this Court employed the following language which we think fully applicable to the instant case:

"* * * Such corporation has no obligation or duty to furnish service to owners of land outside the district. The relationship between plaintiff and defendant was purely contractual. *Such being the case the reasonableness of the conditions or terms of inclusion within the area so as to reap the benefits of the sanitation services is not subject to review by the courts.* The courts may only determine whether the district complied with the terms of the contract. *City of Englewood v. City and County of Denver,* 123 Colo. 290, 229 P. (2d) 667; *City of Ft. Collins v. Park View Pipe Line,* 139 Colo. 119, 336 P. (2d) 716." (Emphasis supplied.)

The plaintiff relies heavily on an excerpt from *Frost v. Railroad Commission of the State of California,* 271 U.S. 583, 70 L.Ed. 1101, 46 S. Ct. 605, in support of its position that the City could not impose conditions upon annexation even though the City had the right to with-

hold annexation if it wished to do so. In our view, the language from *Frost* relied upon by the plaintiff is not pertinent to the questions presented here, when we view that language in its context and in the light of the fact situation in that case, and, indeed, in the light of a case decided just six years later by the Supreme Court of the United States, *Stephenson v. Binford,* 287 U.S. 251, 77 L.Ed. 288, 53 S. Ct. 181.

In *Frost,* the California Supreme Court had itself determined that an amendment to its public carrier law required private carriers already in existence and operating upon the highways of California to change their operation to public carrier service if they wished to continue in business. This the Supreme Court of the United States held California had no power to do, and in that context the language upon which the plaintiff relies was written. In *Stephenson,* supra, through an opinion written by the same justice who wrote *Frost,* the Court held that it was perfectly proper for a state to require a private carrier who had been in business prior to the enactment of a private carrier statute to obtain a permit and be regulated if it wished to continue its business as a condition of using the highways of the State of Texas. The Court pointed out that its decision in *Frost* rested solely on California's interpretation that the new law required a private carrier to become a public carrier if it wished to continue in business.

■ Plaintiff asserts that the agreement between it and the City was *ultra vires.* Assuming, arguendo, that this is so, this is no help to the plaintiff since it is estopped to assert such fact, having received and retained the benefits conferred thereunder, and the contract being fully executed on the part of all parties. See *Stewart v. Board of Com'rs of Phillips County,* 80 Colo. 232, 250 Pac. 562; *Bainbrich v. Boies,* 113 Colo. 458, 158 P. (2d) 736; *Aberdeen Bldg. Corp. v. Rickfords,* 123 Colo. 484, 232 P. (2d) 183; *Mayor of the City of New*

*York v. Sonneborn,* 113 N.Y. 423, 21 N.E. 121; 10 Mc-Quillen *Municipal Corporations,* 3d Ed., Sec. 29.133, p. 509; *Anno.* 122 A.L.R. 1370.

The judgment is reversed and the cause remanded with instructions to dismiss the complaint.

MR. JUSTICE MOORE dissents.

MR. CHIEF JUSTICE McWILLIAMS and MR. JUSTICE SUTTON not participating.

MR. JUSTICE MOORE dissenting.

It is my firm belief that the majority opinion amounts to the longest and most dangerous step yet taken by this court in the general direction of emasculation and destruction of property rights as those rights have been heretofore protected by provisions of the Constitutions of Colorado and the United States. My conviction that the majority opinion is destructive of basic constitutional rights is so deep-seated that I am compelled to express my views at some length and with such force as I am able to command, even though my effort fails to halt the emasculation of constitutional limitations upon the power of government to control the lives of the people and to deprive them of their property and the use thereof. My statement of the facts in the instant case involves some repetition of matters set forth by Mr. Justice Pringle, but I prefer to mention them in proper sequence as they relate to the issues actually argued by counsel, most of which are not mentioned in the "majority" opinion.

The Kitty Hawk Development Co., to which I refer as the Company, was plaintiff in the trial court, and the City of Colorado Springs, hereinafter referred to as the City was the defendant. The action was brought to recover moneys "had and received" by the City because of payment by the Company of a certain subdivision fee exacted illegally by the City as a condition

for annexation to the municipality. To a judgment in favor of the Company, the City directs this writ of error.

In the summer of 1954 representatives of the Company began negotiations for the purchase of approximately 100 acres of land adjacent to the City with the intent to create thereon a subdivision for residence and business purposes, including, inter alia, platting the land and the installation of streets, curbs, gutters, sidewalks, and utilities. The Company finally entered into a contract for the purchase of the property agreeing to pay the sum of $442,215.00 for the land. The contract provided that seller should apply to the city and county officials for plat approval of the subdivision, *but the Company should pay all expenses of the platting and procedures for approval.*

A few days after its execution the contract was amended concerning some time limitations, to include the following:

"It is understood that purchaser shall use due diligence to have said property legally and properly zoned, the plat to said land approved *and arrangements completed for the installation of utilities with the City of Colorado Springs, Colorado, but in the event that said purchaser is unable to obtain said platting, zoning and arrangements for utilities, then this contract shall become null and void* and the payment made hereunder as provided in Paragraph 1, Sub-paragraph A, Page 2 shall be returned to purchaser." (Emphasis supplied.)

The contract was later amended and supplemented on February 18, 1955, the amendment containing recitals that the City had refused to furnish utilities unless the land was annexed to the City; that such annexation was in progress and that certain zoning arrangements for the land had been agreed upon with the City. At the time of entering into the contract to purchase the land, the City of Colorado Springs was acting as a public utility in the furnishing of gas and electrical services within the area of said land but was not acting as a

public utility and was under no obligation to furnish sewer or water services in the area.

At all times pertinent to the controversy there was in effect in the City an ordinance No. 1987, known generally as the Subdivision Ordinance. Section 2-E of this ordinance provided in pertinent part the following:

"The owner of the land in each subdivision shall allocate and convey eight per cent of the area of the land in his subdivision, exclusive of streets and alleys, for park, playgrounds, school, recreational or similar public purposes, at such location as designated by the City or at the option of the City, said owner, shall in lieu of such conveyance of land in kind, pay to the City in cash an amount equal to eight per cent of the value of the land. * * * The proceeds of said payments shall be deposited in a separate City account and shall be used only for the acquisition of land for parks, playgrounds, schools, recreational or similar public purposes. The provisions of this ordinance shall be applicable to each area, territory, subdivision or addition which is being, or is hereafter, annexed to the City of Colorado Springs to the end that there shall be allocated or paid to the City of Colorado Springs the eight per cent in land or value thereof in dollars as herein provided. * * *"

In September, 1954, a plat of Kitty Hawk Subdivision was approved by the Planning Commission and the Board of County Commissioners of El Paso county. At that time a planning engineer employed by the City informed the president of the Company that water and sewer services would not be furnished in the subdivision unless it was annexed to the City, and that upon annexation the area would be subject to various municipal ordinances including the subdivision ordinance above quoted in part.

Having been advised of these various requirements and having met with City officials and commissions regarding what street and zone changes in the subdivision would be acceptable to the City, the president

óf the Company conferred with its Board of Directors to decide whether or not they should proceed with the contract, annex to the City, and comply with the requirements of the subdivision ordinance. The payment which would be required by the City was estimated at from twenty to twenty-five thousand dollars. During the meeting the Board "gave very serious consideration to just dropping the thing." However, at that time approximately $12,000.00 had already been expended which would have been a total loss, and the Company was vulnerable to a suit for specific performance of its contract to purchase the property since it had agreed to do the necessary things to acquire utilities from the city. The Company was placed in a position in which it was required to give eight per cent of its property to the City, or abandon its opportunity to profit from the enterprise and in so doing take a loss of the amount already spent and run the risks involved in a possible suit for specific performance. After analyzing all the factors concerned, the Company decided to proceed with the project, and further amendments to the contract to meet the new situations were consummated with the sellers.

March 8, 1955, the annexation of the land known as Kitty Hawk Subdivision was completed by Ordinance No. 2204 of the City. Said ordinance contained the following provision:

"* * * provided, however, that said territory is subject to all ordinances of the City of Colorado Springs, relating to the extension of Utilities, the Subdivision of said territory and any and all other ordinances in any way affecting said land and territory."

At this point in the factual statement I pause to comment as follows: The above language could not possibly give validity to the subdivision ordinance as applied to the land annexed when said subdivision ordinance is unquestionably unconstitutional as applied to property already within the city. It is clear from numerous de-

cisions of courts of last resort throughout the country, that as applied to land within the city limits the eight per cent forfeiture clause of the subdivision ordinance is unconstitutional.

Every citizen has a right to enter into a lawful business activity and make substantial initial capital investments to develop the same on the basis that no agency of government will make an unconstitutional demand upon him to surrender eight per cent of his property for public use without compensation, under the threat that if he refuses to do so he will suffer an absolute loss of his initial investment, and be required to abandon a project which held excellent prospects for profit, and in addition thereto subject himself to probable litigation for specific performance of a contract involving the expenditures of about half a million dollars. The business compulsion under which the Company "agreed" to give up eight per cent of its property is clearly shown. There is no dispute in the evidence with regard thereto, and yet the opinion to which this dissent is directed makes the startling statement that:

"Much is made in plaintiff's brief of 'business compulsion.' In the instant case the implications of that doctrine are not applicable. The only 'compulsion' legal or otherwise, serving to motivate Morrison and his associates was the desire to make a profit on the Kitty Hawk Subdivision." This statement shows scant understanding of the well-established doctrine of "business compulsion" as will be shown later in some detail.

Mr. Morrison, speaking for the Company, testified in this connection in pertinent part as follows:

"Q. So I take it you were satisfied with your arrangement and deal with the City until it was mentioned by Mr. Cool? A. I wasn't satisfied *but I had to do it.* Q. You had made an agreement and you were satisfied with it, is that right? A. I wasn't satisfied, but I had made an agreement and I had to sell the ground — and I had to have the utilities. (Emphasis supplied.)

The inference from the statement above quoted from the opinion which gives a quick "brushoff" to the all important question of business compulsion is that the "motive" of the Company to earn a profit is not a laudable motive. With this inference I emphatically disagree. The "opinion" indicates that if all a person would be called upon to surrender by refusing to comply with an unconstitutional demand, is the opportunity to make a substantial profit on an enterprise involving very large sums of money, then the doctrine of business compulsion is inapplicable. Exactly the opposite is true under all the modern authorities!

I now return to the facts. Following adoption of the annexation ordinance the plat of Kitty Hawk Subdivision was approved by the city council. This plat reflected certain changes in the original county plat with reference to streets, all as agreed upon by the Company and the City prior to annexation. The new plat contained the statement that the area included therein was, "* * * subject to all ordinances of the City of Colorado Springs, relating to the extension of utilities, the subdivision of said territory and any and all other ordinances in any way affecting said land and territory."

After approval of the plat the Company paid to the City the sum of $25,378.08 pursuant to ordinance 1987-2-E hereinabove quoted. This payment was made August 12, 1955, after which the Company received water and sewer connections and services for which it paid established charges payable by other users. At the expense of the Company water and sewer lines were constructed in the addition, other utilities have been installed, streets have been built and homes have been built on a substantial portion of the lots in the subdivision. Municipal services including fire and police protection have been furnished.

On April 14, 1961 (more than six years after the annexation to the City, but less than six years from the date the "public space fee" of $25,378.08 was paid to the

City) the Company filed its complaint to recover that sum with interest. In its complaint the Company alleged the facts hereinabove stated, and also asserted that the City would not approve the plat and furnish utilities to the subdivision except on the condition that the subdivision be annexed to the City and the Company pay the City the 8% fee of $25,378.08 based upon the appraised value of the land, in compliance with Section 2-E (1) of the Subdivision Ordinance No. 1987; and that the Company paid the aforesaid amount to the City, but the payment thereof and the annexation of the land to the City were done involuntarily by the Company to secure approval of the plat and were induced by economic duress and business compulsion by reason of the monopolistic control of utility services by the City and by its invoking its requirement for the payment of the 8% under its subdivision ordinance. The complaint then recites that Section 2-E (1) of Ordinance No. 1987 is unconstitutional and invalid for a number of reasons and that by reason thereof the Company is entitled to the return of its payment, with interest.

The City answered and pleaded lack of jurisdiction, failure of the complaint to state a claim, laches and the statute of limitations. It admitted that the Kitty Hawk Subdivision was annexed to the City; that the ordinance and statutes mentioned in the complaint were in force at the times mentioned; that a plat of the subdivision was, prior to annexation, approved by the county, and a modified plat thereof was approved by the City on March 22, 1955, after annexation; and that the area covered by the plat was specifically made subject to the ordinances of the City as indicated thereon. The City further admitted that the Company prior to annexation was informed that to obtain water and sewer services the subdivision must be annexed, and that after annexation the Company must comply with various ordinances affecting the subdivision, including the payment of the subdivision fee under Ordinance No. 1987. The payment

of the fee of $25,378.08 on August 12, 1955, was admitted and all other allegations of the complaint denied.

Affirmatively, the City alleged as a defense that during the time the land was outside the City there was no obligation on its part to annex the land or furnish it water or sewer; that prior to annexation Ordinance No. 1987 had no application to the land excepting what applicability it had thereto concerning a major street plan; that with full knowledge of the fact that the City would not serve the area with water and sewer connections unless it was annexed to the City, and unless the Company complied with the payment of the fees required by Ordinance No. 1987, the Company accepted the said conditions and caused the territory to be annexed to the City which accepted it upon said conditions and understanding. The City further alleged that the Company was estopped to rescind the "agreement and condition" upon which annexation was accomplished. Pertinent facts were placed before the trial court on stipulation, and evidence in addition thereto was presented. The trial court found the issues of fact and of law, as contended for by the Company, and entered judgment accordingly. The City is here on writ of error seeking reversal.

The argument on behalf of the City is summarized under eight separate captions. Some of them are interrelated and do not require separate treatment.

The first question for consideration is whether Section 2-E of Ordinance No. 1987 violates the Constitution of the United States or of the State of Colorado. Counsel for the City argue that the ordinance in question, "* * * must be and can be sustained under the police power concept." They argue that zoning ordinances were "originally attacked upon the same constitutional ground as urged in the instant case." It is argued that, "All property is held in subordination to the police power"; and that what constitutes a legal regulation upon land changes with conditions, and that "concentration of

population requires additional restrictions in respect to the use and occupation of land and that regulations now necessary would half a century ago have been regarded as arbitrary." Whether a "regulation" concerning the use and occupation of land is reasonable, as related to zoning laws, is a far different question than the one before us. Counsel for the City recognize the distinction and cite zoning cases only by way of analogy. They supplement the analogy with the following statement:

"However, legislative requirements for compulsory dedications or conveyances of land for street and highway purposes do invoke such physical taking of the land of another."

The case of *Ayres v. City Council of City. of Los Angeles*, 34 Calif. (2d) 31, 207 P. (2d) 1, in which the court held that when Ayres requested the platting and subdivision of lands owned by him he was required to comply with all reasonable conditions relating to width of streets applicable to the area in order to provide for the safety of the public, is cited. I find no fault with this assertion. I agree with the statement of the Supreme Court of Maryland which said in *Krieger v. Planning Commission of Howard County*, 224 Md. 320, 167 Atl. 2, 885:

"Other courts have reached the conclusion that planning requirements under which developers record plats and obtain approval of roads and strips bordering on roads are within the police power and are not compensable."

In the matter of dedication of streets to public use in connection with the voluntary request of a landowner that his land be accepted for development as a "subdivision" for residential purposes, we are dealing with a reasonable regulation imposed upon property concerning a proposed use, and said regulation has a definite relation to the public safety. If the proposed residential area is to be established, ingress and egress to the homes must be established and adequate ways

for traffic through the area are an absolute necessity. There is no basis whatever for comparison between such a situation and an arbitrary demand for forfeiture of 8% of the owner's land.

It is argued that park and recreation spaces have now become "necessary for the public health and welfare." It is said that: "It is well within the legislative prerogative to conclude that a park is as necessary for the public welfare as a wide street." The argument is that the requirement that a landowner give 8% of his land, or 8% of the appraised value of the land, for public purposes of this kind is a reasonable exercise of the police power. It is further argued as ground for reversal that annexation to a municipality is permissive, that a city is under no compulsion to accept a petition for annexation and therefore "the imposition of reasonable conditions precedent by a municipality for acceptance of a petition for annexation is not prohibited."

In opposition to the foregoing contentions of the City the Company presents argument under numerous sub-captions. We direct attention to two of them as follows:

First. "Article II, Section 2E (1), of Ordinance No. 1987, as amended by Ordinance No. 2179, is unconstitutional and violates Article II, Sections 3, 15, and 25, of the Colorado Constitution and Amendment XIV, Section 1, of the Federal Constitution."

The above cited Section 3 describes as an inalienable right the right of "acquiring, possessing and protecting property"; Section 15 provides in part that, "Private property shall not be taken or damaged, for public or private use, without just compensation"; and Section 25 provides that, "No person shall be deprived of life, liberty or property, without due process of law." The provision of the United States Constitution to which reference is made is the "due process" clause of that document.

Second. "Article II, Section 2E (1), of the ordinance cannot be justified as an exercise of the police power."

We consider first the question of whether the subdivision ordinance of the City can be upheld when subjected to the test of the state constitution (Article II, Sec. 15) which provides that, "Private property shall not be taken or damaged, for public or private use, without just compensation." Resolution of this question involves consideration of the further question of whether the City, by agreement with the Company or by compelling compliance with the ordinance as a condition upon which annexation to the City would be accomplished, can lawfully exact the surrender of a constitutional right as a consideration for the exercise of a discretionary governmental power.

Reduced to essentials, the position of the City is that, notwithstanding that the ordinance purports to take private property for public use, without compensation, the Company consented to enforcement of its terms in exchange for annexation and delivery of water and sewer service; that the City, in reliance on the consent of the Company, has granted annexation and provided water and sewer service; that annexation, water and sewer service were granted and furnished in exchange for compliance with an ordinance which takes private property for public purpose without compensation, and that by accepting annexation and water and sewer service under the admitted facts the Company cannot be heard to complain that their constitutional rights have been violated.

Throughout the brief of the City it is freely admitted that under the authority of the ordinance in question, property of the Company has been taken for a public purpose without compensation. The position of the City is that it bargained at arm's length with the Company and is entitled to keep what it bargained for, notwithstanding the constitution prohibits it from "bargaining" in the manner in which it did. The claim is made that the constitutional provision prohibiting such a taking is

inapplicable to the instant case. With this contention I cannot agree.

In *Denver v. Denver Buick, Inc.*, 141 Colo. 121, 347 P. (2d) 919, the constitutionality of a zoning ordinance was before us, and the city of Denver sought to uphold a provision thereof requiring that a property owner set apart a substantial area of his property for the parking of cars as a condition to be met in putting his land to use for business purposes. Our opinion in that case contains much language which is applicable to this case. We quote therefrom the following:

"The legal effect of the argument of the City is that it has a problem of concentration of traffic in the streets and that accordingly there is a right, under the zoning ordinance, to appropriate for off-street parking substantial portions of property of citizens desiring to use that property for a legitimate purpose, and to prohibit the use of that property for any purpose until its owners devote a substantial portion thereof to parking; * * * No such power exists in the city thus to take private property for a public purpose without compensation to the owner for the taking. It would be quite as proper to argue that the city had the right, under the guise of 'zoning' to require dedication of private property for the street itself, if it were considered that a given street was generally inadequate to carry the traffic; and to prohibit the use of property for any legitimate purpose until such dedication was made. If it be true that a traffic problem exists, it cannot be legally solved by confiscation of private property without compensation, under a pretense of 'zoning.'"

The case now before us stands on an even stronger factual foundation than was shown in the case above cited. Here there is an outright taking of all right, title or interest of the property owner, or in lieu thereof a payment to the City of the cash value of the land which might have been acquired by the City had it elected to do so, whereas in *Denver Buick*, supra, the unconstitu-

tional ordinance involved a purported police power regulation relating to the use of land. The regulation there attempted, concerning the use of land, was held to be unreasonable and to result in a taking of private property for public use without compensation. Thus the arguments advanced by the dissenting justices in the *Denver Buick* case as grounds for upholding a, police power "regulation on use" are not pertinent to the contention of the City in the instant case because here the whole interest in the property is confiscated by the City. In *Pioneer Trust and Savings Bank v. Village of Mount Prospect,* 22 Ill. (2d) 375, 176 N.E. (2d) 799, a municipal ordinance required subdividers to dedicate a portion of their land for public use, without compensation. In holding the ordinance invalid the court said, inter alia:

"Section 6 of Article II of defendant Village ordinance imposes an unreasonable condition precedent for the approval of a plat of a subdivision and purports to take private property for public use without compensation."

A similar situation was presented to the Supreme Court of Pennsylvania in *Miller et ux. v. City of Beaver Falls,* 368 Pa. 189, 82 A. (2d) 34. In holding the questioned ordinance unconstitutional the court said:

"\* \* \* If it (the City) desires plaintiffs' land for a park or playground which it considers desirable or necessary for its future progress, it can readily and lawfully obtain this land in accordance with the Constitution which, we repeat, is the Supreme Law of the land. The Constitution of the United States and the Constitution of Pennsylvania empower the city to take and appropriate private land for public purposes. *All that is required is that just compensation be paid therefor.* We do not propose that our Federal or State Constitution shall be disregarded or nullified either directly or by subterfuge, even though the purposes and objectives of a legislative act are worthy and are sincerely believed to be in the best public interest."

The compulsory dedication of private property to a

public use as required by the ordinance in question completely destroys all of the practical value of the constitutional eminent domain provisions. If the City needs land for the use of the public for "park, playground, school, recreational or similar public purposes" it should be acquired by resort to procedures which do not offend constitutional rights of owners of private property. The needed land may be constitutionally acquired through proceedings in eminent domain. The "majority" opinion remains silent upon this phase of the case although counsel for both sides argue the questions involved at great length.

If I correctly understand the opinion of Mr. Justice Pringle, it bypasses constitutional questions by the method of concluding that the Company "agreed" to abide by the unconstitutional ordinance, and having received certain benefits from the "agreement," it should not be permitted to claim a violation of constitutional rights; and the further conclusion that the City had the right to bargain at arm's length with the Company with regard to annexation and water and sewage. These conclusions are without factual support and are flagrantly out of harmony with well established legal principles hereinafter noted. I think it sufficient to quote the following from the opinion of this court in *Town of Sheridan v. Valley Sanitation District*, 137 Colo. 315, 324 P. (2d) 1038, with respect to the argument of the City that it has a right to "bargain" away the provisions of the constitution:

"A municipality cannot use its police power for bargaining purposes. Sheridan attempted to do just that, namely, acquire a sewer system for its own inhabitants by full use of the facilities being created by the District. 'To permit the city to base its action upon considerations of financial benefit to itself would be allowing it to put its powers up for sale to the highest bidder. * * * We say without hesitation that the city has no right to barter with the police powers, or exact for itself financial benefits as a condition for its exercise. Such power must

be exercised for the public good and public welfare, and not for public gain.' *State ex rel. Wisconsin Tel. Co. v. Sheboygan,* 111 Wis. 23, 86 N.W. 657. See also: *Wisconsin Tel. Co. v. City of Milwaukee,* 223 Wis. 251, 270 N.W. 336."

Thus when the Company presented its petition for annexation to the council of the City that body was charged with the duty of granting or denying the petition, depending solely upon whether to do one or the other would be in the promotion of the best interests of the City. A municipality cannot impose a burden upon a landowner which deprives him of a right protected by the constitution as a condition upon which it will exercise a discretionary governmental power.

If, in the protection of his business interests, a landowner is forced to respond to an illegal demand in order to avoid serious loss, a court of justice will restore to him as much of the demand as was illegally exacted and involuntarily "agreed to" by him. This leads me to consideration of the doctrine of "business compulsion" which the opinion in this case deftly brushes off with a single sentence to the effect that it is inapplicable. First — I state the rule as it appears in hundreds of opinions of courts of last resort throughout this nation. It is stated in 70 C.J.S., p. 353, as follows:

"A recovery may be allowed where the payment of an unlawful demand has been obtained by taking an undue advantage of the situation of the payor, or to prevent an injury to his property rights; and, where a person is compelled through the necessity of protecting his business interests to pay an unlawful demand, the payment may be regarded as compulsory so as to permit its recovery."

The doctrine has been well settled in the law for many years. In 1932 Vol. 79 A.L.R. was published. At page 655 of that volume an exhaustive annotation entitled "Doctrine of Business Compulsion" appears. Countless cases from numerous states are cited upholding the doctrine.

I have read approximately forty of these opinions and not one of them can be cited which would support the statement in the majority opinion that, "In the instant case the implications of that doctrine are not applicable." All of them support my conclusion that the payment involved in this case was made under "Business Compulsion." Numerous cases have been added to the law on this subject since volume 79 A.L.R. was published, which demonstrate the fact that the payment made in this case should be recovered by the defendant under the doctrine of Business Compulsion. *Ross System v. Linden Dari-Delite Inc.*, 35 N. J. 329; 173 Atl. (2d) 258; *Rosen v. Village*, 19 Ill. (2d) 448, 167 N.E. (2d) 230; *People ex rel. Carpentier v. Arthur Morgan Trucking*, 16 Ill. (2d) 313, 157 N.E. (2d) 41; *Lewis, et al., v. Fahn, et al.*, 113 Cal. A. (2d) 95, 247 P. (2d) 831.

In the State of Colorado the doctrine of "business compulsion" has been recognized and this court has defined the conditions under which the rule shall be available to recover illegal payments made under an "agreement" secured through such compulsion. The opinion in *Taylor v. Kelleher*, 43 Colo. 424, 97 Pac. 253, quotes with approval the following:

"To constitute the coercion or duress which will be regarded as sufficient to make a payment involuntary, * * * there must be some actual or threatened exercise of power possessed, or believed to be possessed, by the party exacting or receiving the payment, over the person or property of another, from which the latter has no other means of immediate relief than by making the payment. * * *"

The doctrine is particularly applicable to payments demanded and received by governmental agencies under an invalid ordinance or statute. In *Chicago v. Waukesha Imperial Spring Brewing Co.*, 97 Ill. A. 583, the court said that there is a manifest distinction between a demand and threat made by a private individual not possessed of any means of enforcing such threat, and pay-

ment to governmental authority clothed with power to enforce the demand by stoppage of the business of the one to whom the threat is made. In that case the court said that the alternative presented to the payer was 'to submit to the city's exaction or discontinue its business," and that "money paid under such circumstances, in point of law, is not paid voluntarily any more than that which one hands to a highwayman under threat of personal violance."

The principle that payments made to government to prevent the sacrifice of large capital investments are not voluntarily made, but are made as the result of compulsion, was applied by the Supreme Court of Washington in *Olympia Brewing Co. v. State,* 102 Wash. 494, 173 Pac. 430, and the plaintiff was successful in a suit to recover the illegal assessment.

I submit that when the constitution prohibits government from taking private property for public use without compensation, to permit the accomplishment of that result by the device of a so-called "agreement" obtained through business compulsion of the kind clearly established in this case, makes a shambles of constitutionally protected property rights.

In the instant case there is no evidence whatever of an express agreement between the Company and the City. If there is "agreement" it is one implied by the fact that the Company was told that before annexation would be permitted it must comply with the subdivision ordinance and other applicable ordinances, coupled with the fact that the Company paid 8% of the appraised value of its land in lieu of 8% of the land itself. The fact that the directors of the corporation held a meeting to weigh the potential for ultimate success of their project after being advised concerning the demand of the City that 8% of their property must be given up or there would be no water and sewage, and at said meeting determined to go ahead with the enterprise, falls far short of establishing a voluntary agreement between the Company and

the City to surrender the asset. On the contrary it establishes, along with much other evidence, the fact of an involuntary surrender to the illegal demand of the City in order to avoid the substantial losses which would inevitably follow a refusal to comply.

Under the foregoing circumstances I am at a complete loss to understand how those who support the majority opinion can justify the statement contained therein that "Robert Morrison himself and the documentary evidence establishes beyond question that: * * *

"(4) The plaintiff agreed to annex to the City and to make the payment required by the City so that it might receive water and sewer services."

I flatly deny the existence of any such agreement between the Company and the City. There are no "documents" establishing any such an agreement. All the facts point conclusively to an involuntary payment of a sum which the City was forbidden by the constitution to demand. The majority seeks to justify its failure to decide the two important questions involved in this case (namely the constitutionality of the subdivision ordinance and the doctrine of business compulsion) by asserting the controlling fact is that, "the company has no constitutional right" to be annexed to the City, or to secure water and sewage connections. This is a false starting point.

In my view the starting point is the constitutional provision that private property cannot be taken for public use without compensation. This is a limitation upon the power of all governmental agencies. It is applicable to all property whether located inside or outside the limits of any city. No agency of government has the power to accomplish such a result. It follows that any demand by governmental agencies for the surrender of private property for public use without compensation is an unconstitutional demand. The majority seems to hold that if this demand should be made upon a property owner with reference to property already within the city limts, it

would be illegal and unconstitutional, but that it attains a different complexion and gains respectability because the demand (prohibited by the constitution) is made upon the owner of property outside the city. Thus, by the majority opinion "fish" is made out of the property rights of the owner of property inside the city limits, and "fowl" is made of the property rights of the owner of property outside the city.

I take the unqualified position that an agency of government cannot force compliance with an unconstitutional demand by making that illegal demand a condition upon which it will act in any matter wherein discretion is vested in government. In making this statement I am confident that it has the support of the highest judicial authority and the approval of outstanding jurists in the nation. I quote very briefly from four of the numerous cases which could be cited, as follows:

From *Frost & Frost Trucking Co. v. Railroad Commission,* 271 U. S. 583, 46 S. C. 605; 70 L. Ed. 1101:

"Having regard to form alone, the act here is an offer to the private carrier of a privilege, which the state may grant or deny, upon a condition, which the carrier is free to accept or reject. In reality, the carrier is given no choice, except a choice between the rock and the whirlpool — an option to forego a privilege which may be vital to his livelihood or submit to a requirement which may constitute an intolerable burden.

"It would be a palpable incongruity to strike down an act of state legislation which, by words of express divestment, seeks to strip the citizen of rights guaranteed by the federal Constitution, but to uphold an act by which the same result is accomplished under the guise of a surrender of a right in exchange for a valuable privilege which the state threatens otherwise to withhold. It is not necessary to challenge the proposition that, as a general rule, the state, having power to deny a privilege altogether, may grant it upon such condition as it sees fit to impose. *But the power of the state in that respect is*

*not unlimited; and one of the limitations is that it may not impose conditions which require the relinquishment of constitutional rights."* (Emphasis supplied.)

From the concurring opinion of Mr. Justice Frankfurter in *Watson v. Employers Liability Corp.*, 348 U. S. 66 (at page 81):

"It is true that the corporation's entry (to do business) may not be conditioned upon the surrender of constitutional rights * * *"

From *Bynum v. Schiro*, 219 Fed. Sup. 205:

"The City has no power to make its license to an auditorium user depend on the licensee's giving up a constitutional right."

From the opinion of Justice Traynor in *Danskin v. San Diego Unified School Dist.*, 28 Cal. 2, 536, 171 P. (2d) 885:

"A state is without power to impose an unconstitutional requirement as a condition for granting a privilege, even though the privilege is the use of state property."

These basic principles are directly involved in this case. They were treated and resolved by the trial court. They were argued at length by counsel. They should not be ignored by this Court through the use of the sentence "The plaintiff agreed to annex to the City and to make the payment required by the City so that it might receive water and sewer services" when there isn't one word in the record to establish any such agreement, either express or implied, and when there was an abundance of evidence, both direct and circumstantial, to prove the contrary, and when the trial court found that there was no agreement but on the contrary a payment under business compulsion. That which government extorts from the citizen under the pressure of "Business Compulsion" resulting from a demand which the constitution says shall not be made by government, should be returned to the citizen!

I submit that the judgment of the trial court was correct and should be affirmed.

On Rehearing, MR. JUSTICE MOORE files the following addendum to his dissenting opinion:

In the instant case there was only one issue of fact which the trial court was called upon to determine — all other issues were issues of law. All other material facts were admitted. The "jugular vein" of the plaintiff's case was the issue of fact raised by the following allegations contained in the complaint, which were denied in the answer:

"* * *; that plaintiff's annexation to defendant city, and compliance with the conditions of Section 2 E (1) of said ordinance No. 1987, as amended were all done involuntarily and against the will and intent of plaintiff, and for the sole purpose of securing defendant's approval of said plat and for the protection of plaintiff's investment in said land, and because of the economic duress and business compulsion being exerted on plaintiff by defendant as more fully hereinafter set forth." (From paragraph X of the complaint.)

It was further alleged in the complaint that by reason of numerous specified acts on the part of the city: " * * *, the plaintiff was placed in a servient position and the defendant in a dominant position and by reason of the powers incident thereto and hereinabove set forth, defendant was able to exercise, and did exercise, and still exercises dominion, control, coercion, duress and undue influence over plaintiff against its will and intent, and involuntarily, was induced, coerced and compelled to, and did pay to defendant said sum of $25,378.08 as demanded by defendant * * *; that, plaintiff did not give nor loan, nor owe said money to defendant, but was coerced and induced into paying the same to defendant solely and exclusively by reason of business compulsion and economic duress exerted over plaintiff by defendant,

in order that plaintiff could use and develop said tract of land, and to protect and preserve the business interests and investments of plaintiff therein; * * * " (From paragraph XI of the complaint.)

The foregoing allegations of the complaint were denied by paragraph III of the answer.

The affirmative defenses pleaded by the city serve only to emphasize the point that the single question of fact to be determined in the entire controversy was whether the payment in question was a voluntary payment or whether it was a payment made under compulsion and duress. No one with the slightest conception of applicable legal principles would contend that a recovery by the plaintiff could be had in this case upon any theory whatever except upon *the determination as a matter of fact* that the payment was involuntarily made.

The parties to the action, their attorneys, and the trial court thoroughly understood this situation. They fully realized that if the payment by the plaintiff was involuntarily made under business compulsion it could be recovered. They all recognized that if the payment was voluntarily made and was free from duress the plaintiff could not recover! This was the issue of fact upon the determination of which the plaintiff would succeed or fail. This issue was decided by the trial court in favor of the plaintiff!

Upon this single, all important issue the trial court said in its findings, "The Court finds that *plaintiff has not by agreement or waiver,* lost its right to attack the validity or constitutionality of this ordinance * * *"

Notwithstanding this clear and unambiguous statement that no agreement prevented the plaintiff from asserting his constitutional rights, the majority opinion, in some mysterious and wholly unexplained manner, reaches the amazing conclusion that "the plaintiff *agreed* to make the payment."

In entering the judgment for the plaintiff upon the

issues framed by the pleadings the court necessarily and specifically found exactly the opposite.

When a litigant succeeds in establishing by competent evidence the one controlling fact upon which his entire case depends, to the satisfaction of the trial court, it is indeed a tragic thing and a travesty upon justice when an appellate court takes away from him all of the facts which have been adjudicated in his favor, and enters opposite findings of its own for which there isn't the slightest justification in the record of the case.

Thus the majority opinion in this case has deprived the plaintiff of due process of law as guaranteed by the constitution of the United States and of Colorado, and has permitted the City of Colorado Springs to seize 8% of its property for public purposes without compensation.

If the majority opinion is sound, due process of law in Colorado is dead, and the constitution is an empty shell which affords protection to no one against demands by agencies of government which fundamental law commands shall never be made.